**In The**

# United States Court of Appeals for the Third Circuit



## 15-3888

JOHN HARNISH, et al., on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

v.

WIDENER UNIVERSITY SCHOOL OF LAW,

*Defendant-Appellee.*

_____

*On Appeal from the United States District Court for the District of New Jersey*

## BRIEF AND JOINT APPENDIX FOR PLAINTIFFS-APPELLANTS VOLUME I OF IV (Pages Ja1-Ja74)

DAVID S. STONE
DAVID B. HARRISON
DANIELLE F. MORIBER
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
(973) 218-1111

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ....1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS .............................3

STATEMENT OF THE CASE....................................................................3

BACKGROUND AND FACTUAL SUMMARY ...................................................5

I.    Procedural Background...................................................................5

II.   Summary of the Facts......................................................................6

    A.  Widener Published Misleading Employment Statistics ................................6

    B.  Widener's Mass-Marketing Strategy Emphasized the Misleading
       Employment Statistics to Maintain Substantial Enrollment Levels..............8

    C.  Widener Declined to Disclose its Disaggregated Placement Rate and
       Continued to Inflate the Employment Rate Through Dubious Collection
       Strategies....................................................................................11

    D.  Widener Was Able to Charge Inflated Tuition due to
       Misrepresentations about its Employment Rate.........................................14

STANDARD OF REVIEW .....................................................................17

SUMMARY OF ARGUMENT .................................................................17

ARGUMENT ...........................................................................................21

I.    Appellants Met Their Burden of Demonstrating Common Questions
    Predominate....................................................................................21

    A.  Plaintiffs Satisfy Predominance Under the Requirements of Rule 23
       and Third Circuit Case Law ...............................................................22

    B.  The District Court Made a Mistake of Fact and Law by Disregarding
       the Law of the Case and Plaintiffs' Theory as Alleged................................28

i

C.  It Was An Abuse of Discretion to Refuse to Certify the Class Based on a Mischaracterization of Appellants' Damages Model ................................31

D.  The District Court Applied the Wrong Standard to Evaluate Whether Appellants Established a Viable Method of Providing Class-Wide Damages ......................................................................................................35

II.  The District Court Erroneously Found that Typicality was not Satisfied ........39

CONCLUSION ......................................................................................................42

# TABLE OF AUTHORITIES

## Cases

*Bieneman v. City of Chicago,*
  864 F. 2d 463 (7th Cir. 1988) ............................................................................42

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013) ........................................................23

*Erica P. John Fund, Inc. v. Halliburton Co.,*
  131 S. Ct. 2179 (2011) ......................................................................................32

*Gooch v. Life Investors Ins. Co.,*
  672 F.3d 402 (6th Cir. 2012) ............................................................................41

*Hayman Cash Register Co. v. Sarokin,*
  669 F.2d 162 (3d Cir. 1982) .............................................................................29

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.,*
  Civ. No. 03-4558, 2008 U.S. Dist. LEXIS 73690 (D.N.J. Sept. 3, 2008) .........33

*In re Hydrogen Peroxide Antitrust Litig.,*
  552 F.3d 305 (3d Cir. 2008) ................................................................... 22, 24, 36

*In re Intel Corp. Microprocessor Antitrust Litig.,*
  2010 U.S. Dist. LEXIS 144511 (D. Del. July 28, 2010) .....................................26

*In re Linerboard Antitrust Litig.,*
  305 F.3d 145 (3d Cir. 2002) .............................................................................23

*In re Neurontin Antitrust Litig.,*
  MDL No. 1479, 2011 U.S. Dist. LEXIS 7453 (D.N.J. Jan. 25, 2011) ...............25

*In re Neurontin Mktg. & Sales Practices Litig.,*
  712 F.3d 60 (1st Cir. 2013) ..............................................................................27

*In re Warfarin Sodium Antitrust Litig.,*
  391 F.3d 516 (3d Cir. 2004) .............................................................................25

*International Union of Operating Eng'rs v. Merck & Co.,*
    192 N.J. 372 (2007) ............................................................33

*Kugler v. Romain,*
    58 N.J. 522 (1971) .............................................................22

*Lambert v. Blackwell,*
    387 F.3d 210 (3d Cir. 2004) ...............................................29

*Marcus v. BMW of N. Am., LLC,*
    687 F.3d 583 (3d Cir. 2012) ....................................... 31, 41

*Pennsylvania Emp. Benefit Trust Fund v. Zeneca, Inc.,*
    710 F. Supp. 2d 458 (D. Del. 2010) ...................................32

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,*
    998 F.2d 1224 (3d Cir. 1993) ..............................................26

*Pew v. Boggio,*
    Civ. No. 15-1042, 2015 U.S. Dist. LEXIS 157243 (M.D. Pa. Nov. 19,
    2015) ..................................................................................30

*Phillips v. Klassen,*
    502 F. 2d 362 (D.C. Cir. 1974) ..........................................42

*Reyes v. Netdeposit, LLC,*
    802 F.3d 469 (3d Cir. 2015) ...................................... passim

*Saini v. BMW of N. Am.,*
    Civ. No. 12-6105, 2015 U.S. Dist. LEXIS 66242 (D.N.J. May 21, 2015) .. 24, 41

*Sullivan v. DB Invs., Inc.,*
    667 F.3d 273 (3d Cir. 2011) ....................................... 24, 36

*United States v. Bogart,*
    Civ. No. 12-347, 2015 U.S. Dist. LEXIS 55799 (M.D. Pa. Feb 11, 2015) ........30

*Zenith Elec. Corp. v. WH-TV Broad. Corp.,*
    395 F.3d 416 (7th Cir. 2005) ..............................................26

iv

**Statutes**

28 U.S.C. § 1292(e) ...............................................................................................1

28 U.S.C. § 1332...................................................................................................1

28 U.S.C. § 1367...................................................................................................1

**Rules**

Fed. R. Civ. P. 23 ........................................................................................... passim

# STATEMENT OF SUBJECT-MATTER
# AND APPELLATE JURISDICTION

Appellants John Harnish, Justin Schluth, Robert Klein, Gregory Emond, Ayla O'Brien Kravitz, and Christina Marinakis (collectively, "Appellants" or "Plaintiffs"), on behalf of themselves and all others similarly situated, brought this consumer fraud action in the United States District Court for the District of New Jersey against Appellee Widener University School of Law ("Appellee" or "Widener").  The District Court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332 and 1367.  Plaintiffs appeal from the District Court's Opinion and Order entered on July 1, 2015, denying their motion for class certification (JA2-18),[1] as well as the Opinion and Order entered on August 5, 2015, denying reconsideration (JA19-22).  Appellants filed a petition for interlocutory review pursuant to Federal Rule of Civil Procedure 23(f) on August 19, 2015 (JA23), which this Court granted on November 17, 2015 (JA1.) Accordingly, this Court has jurisdiction under 28 U.S.C. § 1292(e).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The issues raised by Plaintiffs-Appellants in the instant appeal concern whether the District Court's denial of Appellants' motions for class certification and reconsideration was reversible error.  Specifically,

---

[1] Materials in the Joint Appendix are cited by page number as JA____.  Materials in the District Court record that are not included in the Joint Appendix are cited by docket number as R.____.

1

1.      Whether the District Court abused its discretion by resting its predominance analysis on a misapplication of law and fact by refusing to follow the law of the case set forth in its prior denial of Appellee's Motion to Dismiss the First Amended Complaint ("FAC") and subsequent Motion for Reconsideration, where the Court correctly held that Appellants' case is based on the theory that all prospective and current students' tuition was impacted by Widener's misconduct and that individual employment outcomes are irrelevant to the ascertainable loss suffered.

2.      Whether the District Court abused its discretion by misapplying law and fact in equating Plaintiffs' expert's statistical regression analysis with a "fraud on the market" theory in determining predominance.

3.      Whether the District Court erred as a matter of law by applying the wrong legal standard for predominance and subjecting Appellants to a burden beyond what is required by Federal Rule of Civil Procedure 23 and Third Circuit precedent.

4.      Whether the District Court abused its discretion by disregarding factual evidence obtained through class discovery of Widener's ongoing fraudulent collection and reporting of graduate employment statistics to determine that Plaintiffs' claims were atypical.

5.    Whether the District Court abused its discretion by relying on speculation and conjecture absent from the Record, suggesting that certain class members might have conflicting interests because they would benefit from Widener's fraud, to conclude that typicality was not satisfied.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously and Appellants are not aware of any cases or proceedings related to this appeal.

## STATEMENT OF THE CASE

This action, brought under the New Jersey Consumer Fraud Act ("NJCFA") and Delaware Consumer Fraud Act ("DCFA"), involves the reporting, publication, and marketing of misleading employment statistics by Widener, tailored to induce prospective students to enroll in its law school and entice current students to stay enrolled.

From 2005 through 2011, Widener repeatedly reported and published a post-graduation employment rate between 90% and 97%.  The purpose of this campaign, spanning several years, was to lead prospective and current students to believe that Widener had a near-perfect success rate at placing its graduates in valuable legal careers.  In reality, Widener had a poor record of placing students in valuable legal positions, and its true post-graduate employment rate was closer to 50%.  Widener intentionally skewed its employment rate by including a variety of

non-legal and part-time positions for which a law degree is neither required nor preferred.   In 2011, after years of reporting employment rates above 90%, exceeding the rates of some of the best law schools in the country, Widener finally revealed that it was actually placing students in full-time legal positions far below the reported rate.

Even after this "revelation," however, as confirmed through discovery, Widener continued to employ deceptive tactics to mislead students about its placement success.   For example, Widener completed graduate surveys without the graduates' authorization, using second- and third-hand information from unreliable and outdated Internet sources.   Additionally, the evidence shows that Widener actively sought employment data from *employed* graduates and avoided collection from unemployed graduates in order to inflate its employment rate.

Pursuant to this intentional scheme implemented by Widener's administrative leadership and marketing personnel, applicants and enrolled students were damaged by Widener's misrepresentation of its placement success. As alleged in the FAC, and as supported by Appellants' expert through a statistical regression model, Appellants' ascertainable loss is the difference between the actual tuition Widener charged during the class period and the tuition it would have been able to charge but for its publication of misleading placement statistics. Actual job placement success of individual students is thus immaterial to the

4

calculation of class-wide damages in this case, as each of the class members paid fraudulently inflated tuition regardless of whether they obtained meaningful legal employment upon graduation.

Initially, the District Court embraced this theory of ascertainable loss, holding that Appellants sufficiently stated a claim for violations of the NJCFA and DCFA. In fact, the District Court admonished Widener for its tactical mischaracterization of the FAC and injecting this red herring into Appellants' damages theory. Subsequently, however, the District Court denied class certification on this very basis, holding that common issues did not predominate because certain class members obtained full-time, legal employment after graduation. The District Court's about-face adoption of this renewed mischaracterization of Appellants' case amounts to clear reversible error. The District Court made further mistakes of law and of fact based on mischaracterizations of Appellants' case and the relevant legal standards to be applied to their claims. Thus, Appellants respectfully request that this Court reverse the erroneous determinations, and order certification of the putative class.

## BACKGROUND AND FACTUAL SUMMARY

### I.    Procedural Background

Appellants filed the instant putative class action under the NJCFA and DCFA in the United States District Court for the District of New Jersey on

February 1, 2012, to recover losses sustained as a result of Widener's fraudulent marketing scheme.[2]  (R. 1.)  Appellants filed the FAC on April 27, 2012.  (JA89.)  On March 20, 2013, the District Court denied Widener's motion to dismiss the FAC and held that Appellants stated claims under both the NJCFA and DCFA in connection with Widener's affirmative misrepresentations and knowing omissions regarding its post-graduation employment statistics.  (JA152-73.)  In May 2013, the District Court denied Widener's motion for reconsideration of that Opinion and Order.  (JA174-83.)  The parties engaged in class discovery for approximately eighteen months, pursuant to the District Court's Order bifurcating discovery between class certification and the merits of Plaintiffs' claims.  (R. 57.)

## II.    **Summary of the Facts**

### A.    **Widener Published Misleading Employment Statistics**

Throughout the class period, Widener reported and published employment rates of between 90 and 97 percent.  (JA103-04 at ¶ 35, 194-99, 246-48.)  That statistic aggregated all employment for its students—regardless of the position, status or degree required, if any—so that a student employed part-time at Starbucks and a student employed as a first-year associate at a major law firm were equally measured and reported as having obtained a job after graduation.  Discovery has revealed that Widener calculated and maintained data differentiating between these

---

[2] Widener moved to dismiss the initial Complaint and filed a separate motion to strike the FAC, both of which the District Court denied.  (R. 6, 9, 20-21.)

categories of graduates, but chose not to report that breakdown. Instead, Widener plastered its publications, halls, website, and advertisements with an employment rate that plainly assured its students that a Widener degree was highly valued in the legal job market. *See* Parts I.B & I.C, *infra*.

In fact, Widener was not placing its students in jobs commensurate with the investment required to obtain a law degree. Indeed, students were forced to return to the jobs they had before starting at Widener because they could not find a full-time, and in many cases even a part-time, position that required or preferred a law degree. (JA209.) As the District Court correctly noted in concluding that this practice was misleading, "Why should a reasonable student looking to go to school consider that data to include non law-related and part-time employment? Should that student think that going to Widener Law School would open employment as a public school teacher, full- or part-time, or an administrative assistant, or a sales clerk, or a medical assistant?" (JA163-64.) Stripping these non-legal, part-time jobs from its bloated statistics, Widener later revealed that it placed students during the class period at a rate of less than 70%, and, as discovery has shown, that true percentage is likely closer to 50% — a far cry from the near-perfect rate it had been reporting.

**B.    Widener's Mass-Marketing Strategy Emphasized the Misleading Employment Statistics to Maintain Substantial Enrollment Levels**

From 2005 to 2011, Widener correctly observed that its reported employment rate was the most influential marketing tool it had for attracting and keeping students.  As Widener knew, it needed a response to its unfavorable ranking, and that response consistently maintained that it placed its students at rates comparable to the best schools in the country.  (JA206.)  To push this message, Widener hired a marketing firm, Aloysius Butler & Clark ("AB&C"), and embarked on a mass-marketing campaign to publicize the reported employment rate.  (JA194.)

Under AB&C's guidance, Widener "develop[ed] a messaging platform and marketing communications strategy to build reputation, increase awareness, and drive inquiries and applications."  (JA1111-13, 1151, 1159:9-60:22.)  To increase applications, Widener and AB&C sought to develop "a compelling message that states why future lawyers and legal professionals should come to Widener." (JA1114.)  Widener and AB&C thus sought to differentiate Widener through an "Only Widener Law" brand positioning statement:  "Only Widener Law creates solid legal professionals who are prepared to advance the practice of law in a rapidly changing global market."    (JA1118.)    Widener's Career Services Department provided AB&C with Widener's employment rate among its important

"bragging points," and directed it to focus on its employment rate as a "unique strength." (JA1173-79.) Thus, standing in the shoes of a potential Widener student, AB&C raised in its internal marketing pitch, "What's in it for me?" the marketing firm answered, "97% job placement rate." (JA1125.)

The coordinated strategy, devised and implemented by Widener administrative leaders and marketing staff with the guidance of AB&C, sought to drive enrollment through its aggregated placement rate by repeatedly emphasizing the misleading statistics to prospective and current students. This scheme included a host of tactics designed to convince students that a Widener law degree equated to employment success, including:

- Advertisements in national publications stating, among other things, "Our 95 percent placement rate says it all," and "[w]ith a 95 percent employment rate, our graduates are clearly prepared to take on the toughest cases and excel in the global application of law." (JA267-69, 1172:13-15, 1246-50);

- Mass-mailings, including targeted letters and brochures, sent directly to potential students (JA249-52);

- Mass-presentations at open houses for prospective students and welcoming events for current students (JA1253, 1256, 1261, 1270-72);

- Oral representations by admissions office personnel to prospective students, particularly students who raised concerns about the school's ranking (JA319:19-20:21, 1104-05);

9

- Targeted materials to accepted students designed to encourage them to choose Widener (JA253-55);

- Materials and information sessions targeting "influencers" such as undergraduate pre-law advisors to become surrogates for Widener's program (JA258, 261-66,1177-79,1211-45);

- Postings and displays throughout the school, including "brag boards" displayed throughout the halls highlighting the aggregated employment rate (JA273:14-277:11, 1104-05, 1276:8-1279:6, 1280-82 (Congratulations to the Class of 2010!! For Achieving a 93% Employment Advanced Degree Rate); 1283-85);

- Career services newsletters and other school publications for current students (JA278-82); and

- Widener's website, a highly valued part of its marketing strategy, which regularly updated its webpages with the aggregated employment rate (JA125-36, 1183:7-25.)

Notably, Widener frequently displayed its aggregate employment rate directly above a pie chart with a breakdown of full-time legal employment only to reinforce the impression that its marketed and reported employment rate included full-time legal employment only. (*See, e.g.*, JA125-36, 278-82.)

The scope and frequency with which Widener reported the aggregate employment rate made it unavoidable by prospective and enrolled Widener students. As a direct and intended consequence of this coordinated mass-marketing campaign, class members believed that Appellee's reported employment statistics accurately reflected its graduates' full-time legal employment rate. (JA204, 208-09, 307:23-308:24, 312:24-313:7.) Accordingly, Widener's

10

perceived placement success allowed it to maintain one of the largest enrollments in the country throughout the class period, with a student body of approximately 1500 students per year, despite its low ranking and high tuition costs.  (*See, e.g.*, JA242-45.)

### C.     Widener Declined to Disclose its Disaggregated Placement Rate and Continued to Inflate the Employment Rate Through Dubious Collection Strategies

Widener employed a detailed process for collecting employment information from graduates within nine months of graduation and placed enormous pressure on its administration, staff and professors to collect that employment data.  (*See* JA200-02, 1286-89.)  Notably, Widener internally tracked graduate employment by type of employment (legal, J.D. preferred, non-legal), the level of employment (full-time, part-time, volunteer), and the area of employment for those students who found full-time legal employment (private practice, judicial clerkship, government, business/industry, public interest).  (*See, e.g.*, JA1293-1316.)

This data revealed very clearly that Widener placed its students in full-time, legal positions at a rate far below 90% (between 50-70%) from at least 2005 through mid-2011; yet, Widener declined to publicly report this revealing information to prospective or current students, or disclose it in a reasonably accessible manner.  (JA200-02.)  For each of the five previous years for which Widener reported its aggregated employment rate, its own internal memoranda

showed a full-time legal employment rate below 70%: 2006 (58%), 2007 (67%), 2008 (67%), 2009 (68%), 2010 (56%). (JA205.) Throughout this time period, Widener reported its employment rate without qualification, strongly suggesting, as confirmed by the District Court, that its students were obtaining meaningful legal employment at the marketed and reported rate. (JA203-04.)

Widener devised additional ways to inflate its employment rate through its collection and counting of student survey replies to obtain "responses" from employed graduates only. (JA201, 1288-89.) For example, in an internal talking point memorandum, Widener instructed staff to achieve a "higher capture rate" among employed students because it "doesn't help if those you capture are unemployed." (JA1317-18.) To fulfill this goal, Widener relied on unreliable and unverified internet research by its staff to forge survey responses without student authorization. (JA201.) For example, Widener classified one class representative as "employed" who was paid hourly as a part-time law clerk. (JA296:7-300:14.) Widener's targeting of employed students, rather than unemployed students, materially inflated its employment rate. These practices continued throughout the class period, including well after Widener publicly reported its disaggregated rate in 2011, revealing that putative class members have *never* been exposed to Widener's *true* employment rate. (*See* JA207, 227.)

Widener regularly acknowledged and discussed internally the dim prospects of legal employment for its graduates; however, Widener never advertised or published the true legal employment rate, nor did Widener provide students with access to information from which they could reasonably discern it.   (JA205.) Thus, while students had been led to believe that more than 90% of Widener graduates obtained paying, full-time legal employment within nine months of graduation, the actual percentage was at minimum 20 to 40 percentage points less, and likely lower than 50%.  (*Id.*)   Nonetheless, Widener's marketing materials continued to promote its employment rate as its great achievement, naturally leading students to believe that a Widener degree was worth more than it actually was.

Class discovery also showed that Widener had the means to clarify the misinformation delivered to students, but chose not to do so.  (JA204-05.)  It was not until 2011 that Widener revealed that its published employment rates included part-time, non-legal and non-paying jobs.  (*Id.*)  Widener also disclosed that only 56% of its 2010 graduates obtained full-time, legal employment within nine months of graduation – a massive departure from the 93% rate originally reported for 2010.   (*See* JA141-46.)   In connection with its aggregate 93% employment/advanced degree rate, Widener also introduced, for the first time in 2011, a disclaimer that stated the aggregate rate included "full and part time legal,

law-related and non-legal positions as well as advanced degree program participation within nine months of graduation." (*Id.*)

As discussed above, however, Widener's concerted effort to skew its data toward graduates with full-time legal employment indicates that the true employment rate is still unknowable to its students. Moreover, even with the partial revelation of disaggregated rates, Widener continued to associate employment rates with its high tuition costs by persuading students that the long-term professional value of a Widener degree justified the price. (JA207.)

### D. Widener Was Able to Charge Inflated Tuition due to Misrepresentations about its Employment Rate

Class discovery confirmed that graduate employment rate is a significant influence on Widener students' decision to choose Widener. (JA206.) By consistently publishing an employment rate of 90% and above, Widener was able to charge students a higher tuition price than it otherwise would have been able to charge. (*Id.*) As alleged, the ascertainable loss suffered by Plaintiffs is the incremental difference between what Widener would have been able to charge absent its affirmative misrepresentations and material omissions and what Widener actually charged. (JA214, 221, 225.)

In denying Appellee's motion to dismiss and its subsequent motion for reconsideration in 2013, the District Court correctly recognized and rejected Defendant's repeated assertions that Plaintiffs' claims are connected to Widener

14

students' ability to obtain post-graduate employment.  Indeed, as the District Court explained then:  "Widener mischaracterizes Plaintiffs' Amended Complaint.  The claimed causal connection is between the allegedly misleading statements and Plaintiffs' inducement to buy legal education from Widener, not whether Plaintiffs received a legal job."  (JA170.)  The District Court further explained that "[h]ere, Plaintiffs allege the loss occurred when they purchased a Widener education under false pretenses for a price higher than they would have if they had known Widener's more accurate employment rate."  (JA180.)

That difference represents the only damages Plaintiffs seek and is susceptible to proof at trial through common evidence, as demonstrated by the multiple regression analysis by Plaintiffs' expert, Dr. Donald Martin.  In light of the District Court's bifurcation order, and Appellee's refusal to provide relevant tuition information during class discovery under the auspices of the District Court's bifurcation order, Dr. Martin developed a preliminary model which accounts for the possibility that merits discovery may require changes to the specific variables used, but clearly satisfies the standard required for class certification.  Through his preliminary model, Dr. Martin found "a statistically significant and positive relationship between reported job placement statistics and tuition costs in law schools offering JD programs" and that "[t]o the extent that law school job placement statistics are overstated or inflated in publicly distributed

15

information including advertisements and/or websites . . . they will be reflected in higher law school tuition costs for JD programs relative to tuition costs that reflect accurate job placement statistics." (JA335-37 at ¶¶ 13, 22.) Thus, Dr. Martin's model is capable of proving class-wide damages. Notably, Appellee did not submit a rebuttal expert report directly responding to Dr. Martin's methodology or findings.

On February 2, 2015, Appellants moved to certify the following class:

> All persons who enrolled in Widener University School of Law and were charged full or part-time tuition within the statutory period for the six-year period prior to the date the Complaint in this action was filed through the date that this Class is certified.

Without oral argument or a hearing, the District Court denied Appellants' motion on July 1, 2015. (JA2-18.) Appellants timely moved for reconsideration, which the District Court denied with little analysis. (JA19-22.) On August 19, 2015, Appellants filed a petition pursuant to Federal Rule of Civil Procedure 23(f) requesting interlocutory review of the District Court's Opinion and Order denying class certification, and its Opinion and Order denying reconsideration of same. This Court granted the petition and permitted appeal on November 17, 2015. (JA1.)

## STANDARD OF REVIEW

In reviewing a denial of class certification, the Court of Appeals reviews a district court's legal rulings *de novo*. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 483 (3d Cir. 2015). A district court's "findings of fact, its application of law to facts, and its decision regarding class certification" are reviewed for an abuse of discretion. *Id.* "The district court abused its discretion if its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.*

## SUMMARY OF ARGUMENT

The District Court's denial of class certification on July 1, 2015 rested on mistakes of fact and of law which directly contradict its previous Opinions, as well as evidence obtained through class discovery. Further, the District Court's denial relied heavily upon a new theory of the case never alleged or asserted by Plaintiffs, but advanced by Defendant and previously rejected by the Court in denying Defendant's motion to dismiss.

Based upon the actual theory alleged by Plaintiffs, class action treatment is appropriate in this case. As found by the District Court at the pleading stage, Plaintiffs' ascertainable loss is the increment in tuition paid by class members due to Widener's fraudulent post-graduate employment statistics. (JA152-72, 174-81.) Put another way, Plaintiffs seek the difference between the tuition that students

17

paid and tuition that they would have paid in the absence of Widener's misleading marketing campaign and publication of false placement statistics, which is ascertainable on a class-wide basis.

At the motion to dismiss phase, the District Court recognized and explained that Plaintiffs' theory regarding ascertainable loss has nothing to do with whether or not a Widener graduate actually obtained employment of any type because students paid inflated tuition from the time they enrolled regardless of post-graduate employment success.  (*Id.*)  This is now law of the case.  Accordingly, once the District Court held that individual employment outcomes are irrelevant to Plaintiffs' theory and the damages that Plaintiffs seek, that issue is also irrelevant to determining whether individual issues predominate.  It was thus a mistake of fact and a misapplication of law to facts to conclude that an individual's post-graduation employment success destroys predominance.

Second, the District Court made a clear factual and legal error when it accepted Defendant's mischaracterization of Plaintiffs' damages theory as "fraud on the market."  The fraud on the market theory permits a presumption of reliance in securities fraud cases based on the assumption that a perfectly functioning market incorporates all available information, including misrepresentations of stock prices.  Here, however, Plaintiffs do not seek to use a fraud on the market

theory as a substitute for proving reliance, in particular because reliance is not an element of any of their claims.

Moreover, Plaintiffs do not assert that law schools operate in a perfectly functioning market, or even that tuition prices reflect all of the elements of what a law school offers. Rather, Widener sets tuition with reference to market demand. Using a widely accepted statistical methodology, Plaintiffs' model shows that had Widener reported its actual placement rate to students, it could not have maintained its enrollment levels at the tuition price charged. This is because similarly ranked schools with the same actual employment rate as Widener charged lower tuitions, all else being equal. Thus, while Plaintiffs acknowledge that tuition price is subject to some market forces, they do not assert that it operates in a perfectly functioning market nor rely on fraud on the market to show class-wide causation.

The manner in which Plaintiffs propose to demonstrate damages on a class-wide basis is through what the District Court agreed is an authoritative and generally accepted method of economic analysis, *i.e.* regression analysis. Appellants' regression analysis establishes two critical facts here: (1) an actual loss, because, taking into account all other facts that affect tuition, Widener's tuition would have had to be lower for it to stay in business if it properly reported its considerably lower placement results; and (2) that this loss is ascertainable, *i.e.*, the precise difference between what Widener did charge and what it could have

charged in the absence of fraud is ascertainable within a reasonable degree of certainty.  Plaintiffs do not seek to recover for any other losses.

Third, the District Court subjected Plaintiffs to an impossible legal standard beyond the predominance requirements of Federal Rule of Civil Procedure 23 and Third Circuit case law, requiring *de novo* review by this Court.  Rather than determine the extent to which Plaintiffs' damages can be demonstrated by common evidence, the District Court evaluated Plaintiffs' expert's claims on the merits and required conclusive proof of Plaintiffs' class damages prior to merits discovery. While recognizing the validity of Plaintiffs' method, the District Court improperly required a showing beyond Rule 23's requirements and concluded that their expert's analysis was "insufficient to *prove* that the proposed class members sustained common damages from Widener's alleged misrepresentations."  (JA15-16 (emphasis added).)

Finally, in denying certification on typicality grounds, the District Court disregarded evidence actually in the record and instead relied on hypothetically conflicting interests entirely absent from the record.  First, the District Court failed to account for the facts learned in discovery regarding Widener's unscrupulous data collection practices, supported by evidence in the record, which enabled it to continue to misrepresent its true placement rate well beyond 2011.  Had the District Court accounted for Widener's continued misrepresentations, it would

have concluded that the claims of all class members are typical because the post-2011 students were exposed to inflated statistics in the same way as the rest of the class. The Court also stated that the interests of the class members might not be aligned due to potential secondary reputational harm to the school which may, to some degree, impact Widener alumni's opinion of the case. The suggestion that this speculative, ancillary harm might destroy typicality is inconsistent with the preponderance of the evidence standard required, as well as the "low threshold" the Third Circuit has set for finding that the typicality standard has been met.

## ARGUMENT

## I.    Appellants Met Their Burden of Demonstrating Common Questions Predominate

When examined under the analytical rubric set forth in Rule 23 and Third Circuit case law, Appellants have satisfied the predominance requirement for class certification. The District Court's predominance analysis and ultimate conclusion that individual issues predominate over common issues was fundamentally flawed in three important respects. First, the Court accepted Defendant's factual mischaracterization of Plaintiffs' allegations and theory of the case, leading to an abuse of discretion. Second, despite the absence in the record of any credible attack to Plaintiffs' method of proving class-wide damages and the preliminary results of their expert's analysis, the District Court abused its discretion by accepting the inaccurate comparison drawn by Appellants' counsel, as opposed to

an expert.  This abuse of discretion led to a fundamental misunderstanding of Plaintiffs' well-established damages model and the erroneous conclusion that Plaintiffs posit a "fraud on the market" theory.  Third, the District Court applied the wrong legal standard and required conclusive proof of class-wide damages in contravention of Third Circuit case law.

### A. Plaintiffs Satisfy Predominance Under the Requirements of Rule 23 and Third Circuit Case Law

"The predominance inquiry focuses on whether 'the questions of law or fact common to class members predominate over any questions affecting only individual members.'"  *Reyes*, 802 F.3d at 482 (quoting Fed. R. Civ. P. 23(b)(3)).  For class certification, Appellants must only show that their theory is "susceptible to proof at trial through available evidence common to the class."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 325 (3d Cir. 2008).  "The Supreme Court has observed that predominance is a test readily met in certain cases alleging consumer or securities fraud[.]"  *Reyes*, 802 F.3d at 488-89; *see also id.* at 491 ("Class actions are often the only practical check against the kind of widespread mass-marketing scheme alleged here."); *see Kugler v. Romain*, 58 N.J. 522, 539 (1971) ("Frequently numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all." (internal quotation marks omitted)).

According to a plain reading of the FAC—and as reiterated by the District Court's previous Opinions regarding the sufficiency of the pleadings—Plaintiffs' claim is that *all* students who paid tuition during the relevant period suffered the same injury when they paid a tuition price fraudulently inflated by Widener.   In order to induce these consumers to enroll, and to stay enrolled, Widener engaged in a mass-marketing campaign which inundated prospective and current students with misleading and inflated graduate employment rates.[3]  Proving this theory depends entirely on common evidence.

First, Plaintiffs' claim focuses exclusively on Widener's conduct, namely the fraudulent mass-marketing campaign which enabled it to charge higher tuition.[4]  *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) ("[C]ommon issues [ ] predominate here because the inquiry necessarily focuses on defendants'

---

[3]  As discussed above, Widener's comprehensive mass-marketing scheme included: advertisements in national publications (JA267-69; JA1172:13-15; JA1246-50); direct mailings to individuals (JA249-52); oral representations by admissions office personnel in response to concerns about the school's rank (JA319-20; JA1104-05); postings and displays throughout the school referred to internally as "brag boards," (JA193-94; JA273:14-77:11); Widener's website (JA125-36); career services newsletters and other school publications (JA278-82); and targeting pre-law advisors due to their influence over prospective students (JA258; JA261-66; JA1177-79; JA1211-45.)

[4] Although the Supreme Court's holding in *Comcast Corp. v. Behrend* requires that a plaintiff's proposed damages methodology be tied to its theory of liability, it does not require that a plaintiff present damages models consistent with *every* possible theory of liability, particularly theories that a plaintiff never alleged.  133 S. Ct. 1426, 1430-31, 185 L. Ed. 2d 515 (2013).  Accordingly, the existence of other theories, such as the straw man theory of post-graduate employment success advanced by Widener, does not bar class certification.

conduct, that is, what defendants did rather than what plaintiffs did."). Indeed, "[t]he Third Circuit has repeatedly held that predominance exists where proof of liability depends on the conduct of the defendant." *Saini v. BMW of N. Am.*, Civ. No. 12-6105, 2015 U.S. Dist. LEXIS 66242, *12 (D.N.J. May 21, 2015) (citing *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298-301 (3d Cir. 2011)). In fact, in addressing Rule 23's commonality requirements, the District Court recognized that "[t]he class claims proceed from a core common contention that Widener engaged in a consistent practice of disseminating misleading employment statistics to prospective and enrolled students. Resolving the truth or falsity of this common contention will drive resolution of this litigation as to all class members." (JA12 (internal citations omitted).) It thus follows that common issues predominate in this case. *Hydrogen Peroxide*, 552 F.3d at 310-11 ("Predominance tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.").

Further, what happened to each plaintiff after sustaining his or her loss, including individual post-graduate employment outcomes, has no bearing on Plaintiffs' claims on a class-wide basis or otherwise and, accordingly, cannot destroy predominance. *Reyes*, 802 F.3d at 489 ("Rule 23 does not require the absence of all variations in a defendant's conduct or the elimination of all individual circumstances."). The only loss Plaintiffs seek to recover is the

incremental difference between the amount of tuition that Widener could have charged but for its fraudulent mass-marketing scheme and the tuition it actually charged. That economic loss is susceptible to proof through common evidence. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004) (finding that class allegations of purely economic loss support a finding of predominance "because there are little or no individual proof problems[.]").

"At the class certification stage, plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class," but instead, "they need only show that a viable method is available to prove damages on a class-wide basis." *In re Neurontin Antitrust Litig.*, MDL No. 1479, 2011 U.S. Dist. LEXIS 7453, *39-40 (D.N.J. Jan. 25, 2011). Even "an inability to calculate damages on a classwide basis will not, on its own, bar certification." *Reyes*, 802 F.3d at 485 (citing *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374-75 & n.10 (3d Cir. 2015) (collecting cases)).

Here, Dr. Martin prepared a damages model that is empirically capable of measuring harm to class members using common proof of impact. (JA332-33 at ¶ 5.) Plaintiffs seek the "difference between the inflated tuition paid by Class members based on the material misrepresentations that approximately 90-95 percent of graduates are employed within nine months of graduation and the true value of a Widener law degree." (JA120-21 at ¶ 90.) Accordingly, Dr. Martin

25

built a statistical regression model using similar schools, and controlling for a number of variables such as location and number of full-time students, to determine with a reasonable degree of certainty what Widener could have charged in the absence of its inflation of graduate employment statistics.[5]  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1238 (3d Cir. 1993) ("[T]he scientific method used by the economists, multiple regression analysis, is reliable."); *In re Intel Corp. Microprocessor Antitrust Litig.*, 2010 U.S. Dist. LEXIS 144511 (D. Del. July 28, 2010) (Regression analysis is generally accepted to assess impact at class certification stage); *Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("[S]ocial science has tools to isolate the effects of multiple variables and determine how they influence one dependent variable . . . . Perhaps the leading tool is the multivariate regression, which is . . . common enough in litigation to earn extended treatment in the Federal Judicial Center's *Reference Manual on Scientific Evidence* (2d ed. 2000).").

As with all law schools, Widener undeniably competes for students with other similarly situated law schools by advertising or publicly communicating to potential students the features of the school that it believes will influence decision making by applicants and, indeed discovery revealed such is the case here.

---

[5]  As indicated by Dr. Martin, some of these variables and specifications may change once merits discovery is complete and Plaintiffs gain full access to merits discovery, as well as the discovery that the District Court ordered Widener to provide over its repeated objection thus far.  (JA16, n.3.)

(JA1087-95, 1106-55.)  Dr. Martin analyzed the tuitions of over 60 law schools, including Widener's, as well as other characteristics, and built a statistical model in accordance with a widely accepted methodology.  *See, e.g.*, *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 60, 68-69 (1st Cir. 2013) ("The existence of individual [doctors' non-reliance on Pfizer's misrepresentations in prescribing Neurontin] does not defeat the implication—clearly presented through [expert] regression analysis—that Pfizer's misinformation had a significant influence on thousands of other prescribing decisions.").  Dr. Martin's model is capable of quantifying, on a class-wide basis, the incremental difference between the amount of tuition that Widener could have charged but for its fraudulent mass-marketing scheme and the tuition it actually charged.

Specifically, the analysis shows that tuition varies directly (and significantly) with the ranking of the school and the reported employment experience of its graduates, together with other identifying characteristics, such as location and class size.  (JA330-54.)  Controlling for other factors, the model demonstrates that a potential law school candidate would not be willing to pay the same tuition to secure a law school degree that gave him or her a 50-70% probability of securing meaningful legal employment—the likely actual post-graduate employment rate—than if that probability were above 90% as reported by Widener.  Finally, Dr. Martin's analysis demonstrates that had Widener advertised

the true full-time employment rate of its graduates, it could not have sustained its

enrollment numbers, and the drop in enrollment would have been statistically

significant enough that Widener would have been unable to compete in the law

school market without lowering its tuition.  Based on the foregoing, Appellants

met their burden of demonstrating a viable method of proving class-wide damages.

### B.    The District Court Made a Mistake of Fact and Law by Disregarding the Law of the Case and Plaintiffs' Theory as Alleged

In March and May of 2013, the District Court denied Widener's motion to

dismiss and motion for reconsideration, affirmatively rejecting Defendant's

argument that Plaintiffs' case relates to the procurement of post-graduate

employment and recognizing that their loss relates only to inflated tuition arising

from Widener's misrepresentations.  (JA169-71, 178.)  In fact, the District Court

held that post-graduate employment was irrelevant to Plaintiffs' theory of

ascertainable loss.  (JA169.)  From this holding, it flows that post-graduate

employment is also irrelevant to determining whether common issues predominate

since it is not an aspect of Plaintiff's case actually alleged.  Therefore, it was an

abuse of discretion to rest on mischaracterizations of Plaintiffs' allegations—which

the court previously rejected and which directly conflict with the law of the case—

to conclude that individual issues predominate.

A district court's application of the law-of-the-case doctrine is reviewed for an abuse of discretion. *Lambert v. Blackwell*, 387 F.3d 210, 236 (3d Cir. 2004). Unless a party formally moves for reconsideration, "[u]nder the law of the case doctrine, once an issue is decided, it will not be re-litigated in the same case, except in unusual circumstances." *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir. 1982) (citing 1B MOORE, FEDERAL PRACTICE 404(1) (1980)). This well-established doctrine "expresses the practice of courts generally to refuse to reopen what has been decided." *Id.* at 169.

Notwithstanding, the District Court reversed its course in denying class certification, this time apparently agreeing with Widener's misrepresentations that Plaintiffs' theory of the case depended, at least in part, on whether a class member obtained post-graduate employment. (JA14.) Specifically, the District Court later reasoned that "Plaintiffs' theory that all Widener students sustained corresponding damages ignores the reality that many students obtained the full-time legal jobs they sought when enrolling at Widener and paying its tuition." (*Id.*) This holding might have some application if Plaintiffs were seeking damages based, in any way, on the type of employment graduates actually obtained; but, because the damages Plaintiffs are seeking are based entirely on what the putative class paid, the impact is determinable on a class-wide basis.

29

To be clear, the District Court's mischaracterization of Appellants' claims is not due to new evidence, changed circumstances or even a different legal standard. Rather, it starkly contradicts the District Court's prior Opinions holding that Appellants stated a claim to relief as a matter of law, and recognizing that their ascertainable loss "occurred when they purchased a Widener education under false pretenses for a price higher than they would have if they had known Widener's more accurate employment rate." (JA180.) The District Court's subsequent departure from its prior holding that post-graduate employment was irrelevant to Plaintiffs' theory of ascertainable loss directly conflicts with the law of the case. *See, e.g.*, *Pew v. Boggio*, Civ. No. 15-1042, 2015 U.S. Dist. LEXIS 157243, at *10 (M.D. Pa. Nov. 19, 2015) (applying law-of-the-case doctrine because defendant failed to demonstrate extraordinary circumstances or other exception to the doctrine); *United States v. Bogart*, Civ. No. 12-347, 2015 U.S. Dist. LEXIS 55799, at *27-28 (M.D. Pa. Feb 11, 2015) (same).

As the District Court correctly stated in its Opinion denying Widener's motion to dismiss, the misleading inquiry proffered by Widener is entirely distinct from and unrelated to Plaintiffs' claim: "Widener mischaracterizes Plaintiffs' Amended Complaint. The claimed causal connection is between the allegedly misleading statements and Plaintiffs' inducement to buy legal education from Widener, not whether Plaintiffs received a legal job." (JA170 (chastising Widener

30

for its mischaracterizations).)  As the District Court correctly explained at the pleading stage, "Plaintiffs allege the loss occurred when they purchased a Widener education under false pretenses for a price higher than they would have if they had known Widener's more accurate employment rate."  (JA180.)  The logical corollary of the District Court's holding is that common issues predominate since the loss occurred when Plaintiffs decided to purchase a Widener education and individual employment outcomes are irrelevant.  On this basis, it was an abuse of discretion to conclude that Plaintiffs did not satisfy predominance on this ground.

### C. It Was An Abuse of Discretion to Refuse to Certify the Class Based on a Mischaracterization of Appellants' Damages Model

In lieu of submitting a rebuttal expert report, Appellee mischaracterized Plaintiffs' damages model, labeling it "fraud on the market" theory.  As discussed above, Dr. Martin's model shows that tuition varies directly with the reported graduate employment rates of Widener's similarly-situated competitors and that Widener behaves as if its published employment statistics will have an effect on the decisions of potential students to apply.  Fraud on the market theory, to the contrary, is used to permit a presumption of reliance in securities cases.  Neither the NJCFA nor the DCFA, however, require Plaintiffs to prove reliance in order to prevail on their claims.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 606 (3d Cir. 2012) ("Importantly, unlike common law fraud, the NJCFA does not require

proof of reliance."); *Pennsylvania Emp. Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 471 (D. Del. 2010) ("Courts consistently have recognized that reliance is not a required element in establishing a claim under the DCFA."). The District Court's adoption of Appellee's mischaracterization led the Court to consider and rule on a case not before it and resulted in an erroneous finding regarding predominance.

Simply put, Plaintiffs' method of proving class-wide damages is not "fraud on the market" theory. As recently explained by this Court:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant that in a case of direct reliance on misrepresentations.

*Reyes*, 802 F.3d at 481 n.13 (alterations omitted); *accord Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011) (Fraud on the market theory is used in securities fraud cases to establish a rebuttable presumption of reliance, namely, that an "investor relies on public misstatements whenever he buys or sells stock at the price set by the market." (internal quotation marks omitted));

32

*International Union of Operating Eng'rs v. Merck & Co.*, 192 N.J. 372, 392

(2007).

Here, the District Court incorrectly relied on *Merck*, a case that involved

experts who used a price inflation theory in the absence of a regression analysis

and without supporting evidence of causation. 192 N.J. at 392. In that case, it was

undisputed that the plaintiff class was not misled by the defendant's fraud. Rather,

the plaintiffs claimed they were impacted by higher prices that resulted from the

defendant's civil RICO scheme. That case is inapposite here, where Plaintiffs use

a regression analysis and have independent evidence of causation. Specifically,

Plaintiffs demonstrate causation on a class-wide basis through their exposure to

Widener's widespread affirmative misrepresentations and material omissions, and

evidence adduced in discovery that Widener promoted, highlighted, and purposely

perverted its data collection processes, indicating that it believed placement rates

were a substantial factor as well. *See In re Ford Motor Co. E-350 Van Prods.*

*Liab. Litig.*, Civ. No. 03-4558, 2008 U.S. Dist. LEXIS 73690, at *86-87 (D.N.J.

Sept. 3, 2008) (finding plaintiffs adequately alleged the causal nexus between their

losses and defendants' misconduct under circumstances distinguishable from

fraud-on-the-market).

Moreover, as discussed above, Dr. Martin's report *tests* whether placement

statistics affect tuition price, without presupposing such a relationship. His

preliminary results show a significant, positive price relationship capable of common proof; however, as it is outside Rule 23's requirements and the Court bifurcated discovery in any event, Dr. Martin had no need to reach a precise damages figure, particularly as Widener withheld specific tuition information under the bifurcation order.

Furthermore, contrary to a fraud on the market theory, Plaintiffs' model does not rely on a perfectly functioning market as asserted by Widener and the District Court. The District Court incorrectly explained that while Plaintiffs' regression analysis "may show that without the alleged misrepresentations . . . Widener *should* have had lower tuition prices, . . . it does not show that it *would* have had lower tuition prices." (JA15-16.) However, Plaintiff's analysis does in fact demonstrate that, in the absence of higher employment statistics, Widener *would have had to* lower its tuition prices, or it could not have stayed in business. So, although it is true that Widener *could* have simply decided to fold or decrease its tuition, *it did not* choose to do so, but instead chose to inflate its employment statistics. Plaintiffs' model relies on the practical reality that some market forces affect law school tuition prices. Thus, under Plaintiffs' theory, if a student has a choice between two similarly ranked schools with the same employment rate, controlling for other relevant factors, he or she will choose the school with a lower tuition price. By increasing its employment rate statistics, Widener was able to

charge a higher tuition and still maintain enrollment. Accordingly, Widener's higher reported employment rate allowed it charge increased tuition in a measurable amount.

In sum, Plaintiffs' damages model is not based on the principles of a fraud on the market theory. It merely asserts that some market forces determine how a school sets its tuition, such that, for example, a school could not simply double its tuition without increasing the quality of the institution in some area, and that a statistically significant positive relationship exists between the employment rate and tuition prices. Accordingly, while Dr. Martin's methodology asserts that tuition prices are subject to some market dynamics, it does not rely on a fraud on the market model. Dr. Martin's methodology, therefore, can be used to accurately calculate damages on a class wide basis and the District Court's conclusion to the contrary amounted to an abuse of discretion.

### D. The District Court Applied the Wrong Standard to Evaluate Whether Appellants Established a Viable Method of Providing Class-Wide Damages

The District Court improperly applied a legal standard for predominance beyond the requirements of Rule 23 and Third Circuit precedent, an error subject to this Court's *de novo* review. *Reyes*, 802 F.3d at 483. First, the District Court incorrectly questioned whether Plaintiffs' damages model was a *valid* method for proving damages on the merits, not whether Plaintiffs established a *viable* method

for proving class-wide damages as the law requires. Second, without the benefit of merits discovery—let alone a hearing, credibility assessment, or any evidence in the Record to the contrary—the District Court concluded that Plaintiffs did not conclusively *prove* class-wide damages. Thus, the District Court's predominance inquiry demanded proofs contrary to Rule 23 and Third Circuit case law, necessitating reversal.

For class certification, Appellants must only show that their theory is "susceptible to proof at trial through available evidence common to the class." *Hydrogen Peroxide*, 552 F.3d at 311. Recently, in *Reyes v. Netdeposit, LLC*, issued after Appellants' petition for interlocutory review, the Third Circuit clarified and reiterated the appropriate legal standard which governs the Rule 23 predominance requirement: "One relevant guidepost that directs the predominance inquiry is that commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members." *Reyes*, 802 F.3d at 489 (internal quotation marks and alterations omitted).

Importantly, the inquiry is entirely divorced from the validity of a plaintiff's claims. *Sullivan*, 667 F.3d at 305 ("A court may inquire whether the elements of asserted claims are capable of proof through common evidence, but lacks authority to adjudge the legal validity or soundness of the substantive elements of asserted claims."); *accord Reyes*, 802 F.3d at 485 ("[T]he Rules and our case law have

consistently made clear that plaintiffs need not actually establish the validity of claims at the certification stage.").   Moreover, "[a] district court errs when it holds a plaintiff seeking class certification to a higher standard of proof than proof by a preponderance of the evidence, and remand is thus appropriate." *Id.*

The Record is devoid of any credible attack to Dr. Martin's methodology or result.   Indeed, the only criticism launched went to the merits and not the methodology itself.   Accordingly, rebutting Widener's contentions would require discovery beyond what Plaintiffs were permitted to gather due to bifurcation.   Notably, Appellee did not submit a rebuttal report to address whether the model prepared by Dr. Martin, an economics expert, was empirically capable of measuring harm to the class using common proof of impact.   (JA332-33 at ¶ 5.)   Instead, Appellee submitted two affirmative reports which are non-responsive and ultimately go to merits issues outside of class discovery, such as whether or not students were actually misled and positing that a benchmark analysis is preferable to establish damages.[6]   The first report, submitted by an expert on consumer

---

[6] Although not necessary to the issue of whether Plaintiffs establish a viable method of demonstrating class-wide damages, Plaintiffs note that Appellee's expert reports suffered from other infirmities as well, including determining merits issues expressly carved out of class discovery by Appellee, relying on disputed facts and information not produced to Plaintiffs during class discovery, and issues entirely irrelevant to Plaintiffs' claims, such as individual reliance.   The second report also asserted that a benchmark analysis would be preferable.   However, that type of economic analysis is not required and the suggestion that it would be preferable is disingenuous since the information required to perform the analysis is

behavior, ponders whether class members' decision to enroll at Widener was uniform or individual.  The second report estimates financial impact on individuals over the course of their lifetimes irrespective of their actual profession and the economic consequences of obtaining a legal education generally.  Critically, Widener did not challenge the validity of Dr. Martin's regression analysis, or that it establishes a relationship between tuition price and published employment rates.

Notwithstanding, the District Court explained:

> Although multiple regression analysis is a viable method of economic analysis, Plaintiffs' theory of damages still relies on a market dynamic that they have not proved to exist. Whereas securities markets are theorized to reflect material public information in security prices, Plaintiffs offer no evidence that a similar market dynamic adjusts law school tuition levels to reflect public disclosures about the schools' employment rates.
>
> . . . .
>
> The regression analysis may show that without the alleged misrepresentations, according to prevailing law school tuition levels, Widener *should* have had lower tuition prices, but it does not show that it *would* have had lower tuition prices.  Plaintiffs' regression analysis is insufficient to prove that the proposed class members sustained common damages from Widener's alleged misrepresentations.

(JA15-16.)[7]

_____

non-public information which was withheld by Widener as merits discovery. (JA1042-43.)

[7] Notably, Dr. Martin's methodology *is* capable of demonstrating with statistical analysis the market dynamic on which he relies; namely, that post-graduate placement statistics affect law school tuition.

Thus, the District Court's contention was not with Plaintiffs' method of analysis, but that Plaintiffs failed to conclusively prove class damages prior to merits discovery. Thus, without any evidence in the Record to the contrary, the District Court concluded that Plaintiffs failed to meet an impossible burden. This standard is well-beyond that which is demanded at the class certification stage. In light of these fundamental flaws, the District Court's conclusion must be reversed.

## II.   <u>The District Court Erroneously Found that Typicality was not Satisfied</u>

In deciding that "[i]t is not clear that all members of the proposed class were exposed to the false representations or omissions Plaintiffs allege," the District Court erred by disregarding evidence of Widener's post-2011 misrepresentations revealed through discovery. (JA17.) "The law does not permit a district court to only consider and analyze the most significant evidence. Rather, the trial court must consider all relevant evidence and arguments . . . unless there is a reason to reject certain testimony." *Reyes*, 802 F.3d at 495 (internal quotation marks omitted).

While the Amended Complaint alleges that Widener revealed a comprehensive summary of employment data in or about early 2012, Plaintiffs have established that Widener continues to misrepresent the true employment rate through unscrupulous data collection practices, including "capturing" only survey responses from employed students and changing graduate survey responses

39

without verification or authorization. (JA199-205.) Specifically, the Record shows that Widener instructed its staff to target and "achieve a higher capture rate" for students employed after graduation because it "doesn't help if those you capture are unemployed." (JA1317-18.) The record also shows that this directive was followed. Widener staff forged student surveys, marking them as "employed" based on unreliable Internet and social media searches, without the knowledge or authorization of the so-called survey-respondents, and without validating the accuracy of the purported survey responses. These practices skewed Widener's data collection, artificially and, in some cases, incorrectly, increased employment rates based on bad information.

The continued exposure to misrepresented employment data demonstrates, based on Plaintiffs' actual damages theory, that there is no distinction between the exposure of the pre- and post-2011 students.[8]  (See JA1326-28).  Because Plaintiffs' damages model involves only the incremental difference in the published employment rate and actual employment rate, the claims of all Widener students throughout the class period are typical.

In addition, the District Court suggested Plaintiffs' claims are atypical because it is "possible" that some putative class members "might" have interests

---

[8] Even if a finding to the contrary might warrant sub-classes, it does not warrant a denial of certification altogether.

that would not align with others because a determination that Widener is liable for fraud might further damage the reputation of the law school to their detriment. (JA17.)    As an initial matter, and as noted above, "[f]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *Reyes*, 802 F.3d at 484.    The Record here is devoid of any indication that any person, let alone a putative class member, would want Widener's fraud to remain undisclosed and unresolved.    The District Court's suggestion otherwise was purely speculative.

Second, hypothetical or not, reasons why *potential* class members would choose to participate in this action does not, as a matter of law, demonstrate that the interests of *these* class members are not sufficiently aligned.    In analyzing typicality, courts must look to whether the interests of the class representatives are "markedly" or "significantly" different from those of other plaintiffs in material respects. *Marcus*, 687 F.3d at 598; *Gooch v. Life Investors Ins. Co.*, 672 F.3d 402, 429 (6th Cir. 2012).    The Third Circuit has set "a low threshold for satisfying typicality," which is "established" if the class members have "similar claims involving the same conduct by the defendants."    *Saini*, 2015 U.S. Dist. LEXIS 66242 at *9.    Typicality does not require that all class members have identical claims, or that all class members perceive those claims the same way. *Id.*

Finally, this matter is factually distinguishable from those relied on by the District Court in its typicality analysis because *all* putative class members here have actually suffered the damages alleged by Plaintiffs and, accordingly, "significant antagonism" simply does not exist here. *C.f. Phillips v. Klassen*, 502 F. 2d 362, 366 (D.C. Cir. 1974) (certification denied where some plaintiffs' interests were "in significant part" antagonistic to others whom would not benefit from the requested relief that their payments and retirement status be retroactively voided); *Bieneman v. City of Chicago*, 864 F. 2d 463, 465 (7th Cir. 1988) (certification denied where many putative class members in airport noise action "undoubtedly derived great benefit" from being near a transportation hub for other reasons). Surely, if courts were to consistently bar class certification on speculating any possible reason that some class members might potentially prefer not to sue the accused party (in this case, because some members might prefer that their alma mater not be cast in a negative light due to its fraud), pursuit of class certification would often, if not always, be futile.

## <u>CONCLUSION</u>

For the foregoing reasons, Appellants request that the Court vacate the District Court's Class Certification and Reconsideration Opinions and Orders,

and remand the matter to the District Court with directions to certify the class.

Dated:       February 8, 2016              Respectfully submitted,

                                          STONE & MAGNANINI LLP

                                          By:   s/ David S. Stone
                                               David S. Stone
                                               David B. Harrison
                                               Danielle F. Moriber
                                          100 Connell Drive, Suite 2200
                                          Berkeley Heights, NJ 07922
                                          Tel: (973) 218-1111
                                          Fax: (973) 218-1106
                                          dstone@stonemagnalaw.com
                                          dharrison@stonemagnalaw.com
                                          dmoriber@stonemagnalaw.com

                                          *Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF MEMBERSHIP IN BAR</u>

I, David S. Stone, hereby certify that pursuant to Local Appellate Rule 28.3(d), I am a member of the Bar of this Court and I was admitted on December 18, 1987.

## <u>RULE 31(a)(7) CERTIFICATE</u>

I hereby certify that the foregoing Brief for Appellants contains 9,402 words and otherwise complies with Federal Rule of Appellate Procedure 32(a)(7).

## <u>CERTIFICATE OF IDENTICAL TEXT</u>

I hereby certify that the text of the E-Brief and the text hard copies of this Brief are identical to one another.

## <u>CERTIFICATE OF VIRUS CHECK</u>

I hereby certify that a virus check was performed on this Brief using  Symantec Antivirus Corporate Edition virus protection software.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the Brief for Appellants John Harnish, et al. was served on this 8th day of February, 2016 via ECF.

It is so Certified the 8th day of February, 2016:

<u>/s/ David S. Stone        </u>
David S. Stone (DS8580)

# JOINT APPENDIX

# VOLUME I OF IV

i

# TABLE OF CONTENTS

Page

## VOLUME I

Order granting Petition for Leave to Appeal,
dated November 17, 2015 ........................................................................ Ja1

Order of the Honorable William H. Walls denying Plaintiffs'
motion for class certification, dated July 1, 2015, Appealed
From ....................................................................................................... Ja2

Opinion of the Honorable William H. Walls in Support of
Order denying Plaintiffs' motion for class certification,
dated July 1, 2015, Appealed From ........................................................ Ja3

Order of the Honorable William H. Walls denying Plaintiffs'
motion for reconsideration of Order denying Plaintiffs'
motion for class certification, dated August 5, 2015,
Appealed From ....................................................................................... Ja19

Opinion of the Honorable William H. Walls in Support of
Order denying Plaintiffs' motion for reconsideration of
Order denying Plaintiffs' motion for class certification,
dated August 5, 2015, Appealed From .................................................. Ja20

Plaintiffs' Petition for Leave to Appeal Pursuant to Fed. R.
Civ. P. 23(f), dated August 19, 2015 .................................................... Ja23

## VOLUME II

Docket Entries............................................................................................ Ja75

Amended Class Action Complaint, dated April 27, 2012 .......................... Ja89

Exhibit A - Widener Law School 2011 Graduate Employment
Survey ................................................................................................. Ja125

Exhibit B - Widener Law School employment statistics for
years 2005-2001) ................................................................................ Ja129

Exhibit C - Article, Bill Hebert, "What is the Value of the law
Degree?", California Bar Journal, February 2011 .............................. Ja137

ii

Exhibit D - Widener Law School Employment Statistics and
Trends  for Class of 2010......................................................................Ja141

Exhibit E - Article, Paul Campos, "How Law Schools
Completely Misrepresent  Their Job Numbers," The New
Republic, April 25, 2011.......................................................................Ja147

Opinion denying Defendant's Motion to Dismiss Plaintiffs'
Amended Complaint, dated March 20, 2013 .......................................Ja152

Order denying Defendant's Motion to Dismiss Plaintiffs'
Amended Complaint, dated March 20, 2013 .......................................Ja173

Opinion denying Defendant's Motion for Reconsideration of
Opinion and Order denying Defendant's Motion to Dismiss
Plaintiffs' Amended Complaint, dated May 3, 2013. ..........................Ja174

Order denying Defendant's Motion for Reconsideration of
Opinion and Order denying Defendant's Motion to Dismiss
Plaintiffs' Amended Complaint, dated May 3, 2013. ..........................Ja182

Amended Order denying Defendant's Motion for
Reconsideration of Opinion and Order denying Defendant's
Motion to Dismiss Plaintiffs' Amended Complaint, dated
May 7, 2013 .........................................................................................Ja183

Memorandum of Law in Support of Plaintiffs' Motion to
Certify Class Pursuant to Federal Rule of Civil Procedure
23(a) and (b)(3), dated February 2, 2015 ............................................Ja184

Declaration of Jason C. Spiro in Support of Plaintiffs' Motion
to Certify Class, dated February 2, 2015 (Unsealed version
filed September 18, 2015)....................................................................Ja231

Exhibit 3 - Relevant Portion of ABA LSAC Official Guide,
10th Edition...........................................................................................Ja242

Exhibit 14 - Relevant Portion of Dean's Annual Report 2006-
2007......................................................................................................Ja246

Exhibit 15 - Form letters to Prospective Students ..............................Ja249

iii

Exhibit 20 - Document entitled "Now that I Am Accepted, How Should I Choose a Law School?"................................................. Ja253

Exhibit 21 - Relevant portions of Document entitled "Widener University School of Law Information Session Wilmington, Delaware" ............................................................................................ Ja256

Exhibit 22 - Additional Relevant portions of Document entitled "Widener University School of Law Information Session Wilmington, Delaware"........................................................... Ja259

Exhibit 24 - Newsletter entitled "Widener Law two great campuses. Countless paths to success. February 2008" ...................... Ja262

Exhibit 25 - Relevant portions of the National Jurist The Magazine for Law Students November 2009 Vol. 19 No. 3 ............... Ja267

Exhibit 31 - Excerpts of Transcript of Deposition of A. O'Brien Kravitz, dated October 23, 2013 ........................................... Ja270

Exhibit 35 - Document entitled "WIDENER LAW CAREER CONNECTION," WINTER EDITION, January 2008....................... Ja278

Exhibit 36 - Document entitled "Career Development Office"........... Ja283

Exhibit 40 - Form letter from L. Ruffin ................................................ Ja289

Exhibit 48 - Excerpts of Transcript of Deposition of G. Emond, dated November 1, 2013 ........................................................ Ja291

Exhibit 49 - Facebook printout of communication between B. Barros and G. Emond........................................................................ Ja301

Exhibit 50 - Excerpts of Transcript of Deposition of J. Harnish, dated October 21, 2013 ........................................................... Ja304

Exhibit 51, Excerpts of Transcript of Deposition of R. Klein, dated January 30, 2014 ........................................................................ Ja309

Exhibit 52, Excerpts of Transcript of Deposition of C. Marinakis, dated November 15, 2013.................................................. Ja314

Exhibit 53, Excerpts of Transcript of Deposition of J. Schluth, dated October 15, 2013 ........................................................................ Ja321

Exhibit 55 - Printout from the Widener Law Admissions Blogs.........Ja325

Exhibit 56 - Expert Report of Donald L. Martin, Ph.D.,  dated
September 2, 2014 ...........................................................................Ja330

Exhibit 57 - Plaintiffs' Supplemental Response to
Interrogatory Nos. 5 and 15 .................................................Ja355

Declaration of Thomas F. Quinn, Esq. in Opposition to
Plaintiffs' Motion to Certify Class Pursuant to R.23(a) and
(b)(3), dated April 3, 2015 ..................................................Ja370

Exhibit 1 - Widener's Viewbooks........................................Ja375

Exhibit 2 - Excerpts of Transcript of Deposition of A. O'Brien
Kravitz, dated October 23, 2013 .....................................Ja456

Exhibit 3 - Excerpts of Transcript of Deposition of G. Emond,
dated November 1, 2013 ..................................................Ja463

Exhibit 5 - Excerpts of Transcript of Deposition of C.
Marinakis, dated November 15, 2013.................................Ja470

Exhibit 6 - Widener "Scholarships/Grants provided to
individuals by Widener University ....................................Ja476

Exhibit 7 - Excerpts of Transcript of Deposition of J. Schluth,
dated October 15, 2013 .......................................................Ja478

Exhibit 9 - Excerpts of Transcript of Deposition of J. Harnish,
dated October 21, 2013 .......................................................Ja484

Exhibit 10 - Excerpts of Transcripts of Deposition of R. Klein,
dated January 30, 2014 .....................................................Ja491

Exhibit 12 - Widener Information Sheets ...........................Ja496

Exhibit 15 - Agenda for "Information Session/Open House";
Outline for "Information Session"; Agenda and Checklists for
"Accepted Applicants Day" ................................................Ja503

v

# Volume III

Exhibit 16 - Invitations for Open Houses ........................................... Ja557

Exhibit 17 - Declaration of B. Ayars, dated March 30, 2015 .............. Ja574

Exhibit 20 - Report of Professor Ravi Dhar, Ph.D., dated
October 31, 2014 ................................................................................ Ja829

Exhibit 21 - American Bar Association "Standard 509 – Basic
Consumer Information," prior to 2012 ............................................... Ja861

Exhibit 22 - American Bar Association 2009 – 2011 "Annual
Questionnaire Part 1 –   General – 24b Placement Data" ................... Ja864

Exhibit 23 - Declaration of L. Ruffin, dated March 31, 2015 ............. Ja868

Exhibit 24 - Report of Professors Michael Simkovic and Frank
McIntyre, Ph.D., dated  October 30, 2014 ......................................... Ja911

Exhibit 25 - Excerpts from "ABA-LSAC Official Guide to
ABA-Approved Law Schools," for Classes of 2004 to 2009;
"Chapter 10: Finding a Job" with Guide Cover;  ABA data for
Classes 2010 and 2011 ....................................................................... Ja945

Exhibit 26 - Excerpts of "U.S. News & World Report Ultimate
Guide to Law Schools," 1st to 4th Editions; "How to Use
Directory" .......................................................................................... Ja986

Exhibit 27 - Excerpts of "The Princeton Review Best Law
Schools," 2005 – 2006 Editions; "Chapter 13 – How to Use
The Book – Employment Information" ............................................. Ja1007

Reply Brief in Support of Plaintiffs' Motion to Certify Class
Pursuant to Federal Rule of Civil Procedure 23(a) and
(b)(3), dated April 20, 2015 .............................................................. Ja1023

Memorandum of Law in Support of Plaintiffs' Motion for
Reconsideration of the Court's July 1, 2015 Opinion and
Order Denying Class Certification, dated July 15, 2015 .................. Ja1048

vi

Brief in Opposition to Plaintiffs' Motion for Reconsideration of
  Denial of Class Certification on behalf of Defendant the
  Delaware Law School of Widener University, Inc., dated
  August 3, 2015 ................................................................................. Ja1068


**VOLUME IV (SEALED)**

Sealed Exhibits to Declaration of Jason C. Spiro in Support of
  Plaintiffs' Motion to Certify Class, dated February 2, 2015

  Exhibit 1 - The Creative Brief prepared for Widener
  University – Law School by Brownstein Group, dated
  September 9, 2006 ........................................................................... Ja1087

  Exhibit 2 - Widener University School of Law Marketing
  Communications Plan Proposal, dated August 5, 2008 .................... Ja1091

  Exhibit 4 - E-mail for L. Ammons to L. Ruffin re: Jobs, dated
  January 14, 2010 ............................................................................. Ja1096

  Exhibit 5 - E-mail from L. Ruffin to L. Ammons re: Class of
  2009 Employment statistics, dated March 9, 2010 ........................... Ja1098

  Exhibit 6 - Memorandum to L. Ammons from L. Ruffin re:
  CDO Accomplishments 2009-2010, dated August 25, 2010 ............. Ja1100

  Exhibit 7 - E-mail from P. Garrison to L. Ruffin re: Request
  by the Dean, dated October 4, 2007 ................................................. Ja1104

  Exhibit 8 - Aloysius Butler & Clark (AB&C) presentation
  entitled "Widener Law, Building a Strategic Messaging
  Platform for Marketing Communications" ....................................... Ja1106

  Exhibit 9 - Excerpts of Transcript of Deposition of B. Ayars,
  dated July 31, 2014 ......................................................................... Ja1156

  Exhibit 10 - E-mail from B. Ayars to L. Ammons and MJ
  Yarbrough re: Meeting with Marketing Firm, dated August 14,
  2008 ................................................................................................ Ja1173

  Exhibit 11 - Letter from B. Ayars to S. Short, dated August 7,
  2008 ................................................................................................ Ja1175

vii

Exhibit 12 - AB&C's Creative Brief, dated May 21, 2009 ............... Ja1177

Exhibit 13 - Excerpts of Transcript of 30(b)(6) Deposition of
E. Daly, JD, dated May 28, 2014 ..................................................... Ja1180

Exhibit 16 - Email from E. Kniskern to B. Ayars re: Class of
2009 Employment Statistics, dated March 22, 2010 ........................ Ja1184

Exhibit 17 - Portions of document entitled "Widener
University School of Law Open House Wilmington, Delaware
Campus" ........................................................................................... Ja1188

Exhibit 18 - Additional portions of document entitled
"Widener University School of Law Open House Wilmington,
Delaware Campus" .......................................................................... Ja1191

Exhibit 19 - Additional portions of document entitled
"Widener University School of Law Open House Wilmington,
Delaware Campus" .......................................................................... Ja1194

Exhibit 23 -  E-mail from B. Ayars with attachment, dated
March 2, 2010 .................................................................................. Ja1211

Exhibit 26 - E-mail from L. Bulik to B. Ayars and L. Ammons
attaching School of Law Brand Ads ................................................. Ja1246

Exhibit 27 - Document entitled "DELAWARE – WELCOME
TO THE PROFESSION, WED., AUGUST 13, 2008,
DOUBLE TREE HOTEL" ............................................................... Ja1251

Exhibit 28 - Document entitled "HARRISBURG –
WELCOME TO THE PROFESSION, TUES. AUGUST 12,
2008, MOOT COURTROOM" ........................................................ Ja1254

Exhibit 29 - Document entitled "HARRISBURG –
WELCOME TO THE PROFESSION, TUES. AUGUST 11,
2009, MOOT COURTROOM" ........................................................ Ja1257

Exhibit 30 - E-mail from P. Garrison to L. Ruffin attaching L.
Ammons 2010 remarks for the Welcome to the Profession
event, dated July 5, 2011 .................................................................. Ja1270

viii

Exhibit 32 - Excerpts of Transcript of Deposition of L. Ruffin, dated July 31, 2014 ............................................................ Ja1273

Exhibit 33 - E-mail from Y. Pickens to L. Ruffin attaching Class of 2010 poster, dated March 14, 2011 ...................................... Ja1280

Exhibit 34 - E-mail from Y. Pickens to L. Ruffin attaching Class of 2010 poster, dated  March 16, 2011 ..................................... Ja1283

Exhibit 37 - Document entitled "Employment Statistics Timetable" ........................................................................ Ja1286

Exhibit 38 - Email from K. Durkin to L. Ruffin re: Class of 2009 employment stats – interim report, dated January 14, 2010 .................................................................................. Ja1288

Exhibit 39 - Document entitled "GRADUATE SURVEY FORM – CLASS OF 2010" .............................................................. Ja1290

Exhibit 41 - Document entitled "Employment Report and Salary Survey as of February 15, 2007" ............................................. Ja1293

Exhibit 42- Document entitled "Employment Report and Salary Survey as of February 15, 2008" ............................................. Ja1297

Exhibit 43 - Document entitled "Employment Report and Salary Survey as of February 15, 2009" ............................................. Ja1302

Exhibit 44, Document entitled "Employment Report and Salary Survey as of February 15, 2010" ............................................. Ja1306

Exhibit 45 - Document entitled "Employment Report and Salary Survey as of February 15, 2011" ............................................. Ja1311

Exhibit 46 - Document entitled "US NEWS & WORLD REPORT Talking Points" ................................................................. Ja1316

Exhibit 47 - G. Emond's Graduate Survey Forms – Class of 2011 .................................................................................. Ja1321

Exhibit 54 - Email from E. Kniskern to B. Ayars and AS Delpuerto attaching PLA Newsletter, dated November 21, 2011 .................................................................................. Ja1325

Brief in Opposition to Plaintiffs' Motion to Certify the Class
    Pursuant to Rule 23(a) and 23(b)(3) on Behalf of Defendant
    The Delaware Law School of Widener University, Inc.,
    dated April 3, 2015 ........................................................................ Ja1329

Sealed Exhibits to Declaration of Thomas F. Quinn, Esq. in
    Opposition to Plaintiffs' Motion to Certify Class Pursuant
    to R. 23(a) and (b)(3), dated April 3, 2015

    Exhibit 4 - Correspondence from Widener to Plaintiff G.
    Emond, dated January 27, 2009 and July 7, 2009; Widener
    Transcript Excerpts .......................................................................... Ja1384

    Exhibit 8 - Correspondence from Widener to Plaintiff J.
    Schluth, dated January 25, 2008 and June 19, 2008; Widener
    Transcript Excerpts .......................................................................... Ja1389

    Exhibit 11 - Correspondence from Widener to Plaintiff R.
    Klein, dated February 6, 2006; Widener Transcript Excerpts ........... Ja1394

    Exhibit 13 - Excerpts of Transcript of Deposition of L. Ruffin,
     dated July 31, 2014 .......................................................................... Ja1398

    Exhibit 14 - Excerpts of Transcript of B. Ayars, dated July 31,
    2014................................................................................................. Ja1414

    Exhibit 18 - Admissions Questionnaires........................................... Ja1425

    Exhibit 19 - Matriculation Surveys.................................................... Ja1465

    Exhibit 28 - Employment Summary Sheets entitled
    "Employment Report and Salary Surveys"........................................ Ja1555

    Exhibit 29 - Applicant Records......................................................... Ja1574

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

August 31, 2015
CCO-104

No. 15-8086

JOHN HARNISH; JUSTIN SCHLUTH; ROBERT KLEIN;
GREGORY EMOND; AYLA O'BRIEN KRAVITZ; CHRISTINA MARINAK,
Petitioners

v.

WIDENER UNIVERSITY SCHOOL OF LAW

(D.N.J. No. 2-12-cv-00608)

Present: FUENTES, GREENAWAY, JR. and VANASKIE, <u>Circuit Judges</u>

1. Petition for Leave to Appeal pursuant to Fed. R. Civ. P 23(f) filed by
   Petitioners John Harnish, Justin Schluth, Robert Klein, Gregory Emond, Ayla
   O'Brien Kravitz and Christina Marinak;

2. Response to Petition for Leave to Appeal pursuant to Fed. R. Civ. P. 23(f) filed
   by Respondent Widener University School of Law.

Respectfully,
Clerk/tmm

_____ ORDER _____

The foregoing petition for leave to appeal is granted

By the Court,

<u>s/ Thomas I. Vanaskie</u>
Circuit Judge

Dated: November 17, 2015
tmm/cc: all counsel of record



A True Copy:

Marcia M. Waldron, Clerk

-Ja1-

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOHN HARNISH, et al., on behalf of themselves and all others similarly situated, | **ORDER** |
| Plaintiffs, | Civ. No. 12-00608 (WHW) (CLW) |
| v. | |
| WIDENER UNIVERSITY SCHOOL OF LAW, and DOES 1-20, | |
| Defendants. | |

**Walls, Senior District Judge**

It is on this 1st day of July, 2015:

ORDERED that Plaintiffs' motion for class certification is denied.


**/s/ William H. Walls**
United States Senior District Judge

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

JOHN HARNISH, et al., on behalf of themselves and
all others similarly situated,

Plaintiffs,

v.

WIDENER UNIVERSITY SCHOOL OF LAW, and
DOES 1-20,

Defendants.

---

**OPINION**

Civ. No. 12-00608 (WHW) (CLW)

---

**Walls, Senior District Judge**

Plaintiffs are alumni of Widener Law School who allege that the school violated consumer

fraud statutes by misrepresenting the employment success of its graduates. Plaintiffs filed a class

action complaint on behalf of themselves and similarly situated former Widener Law School

students. They now seek the Court's certification of their proposed class under Federal Rules of

Civil Procedure 23(a) and 23(b)(3). Decided without oral argument under Federal Rule of Civil

Procedure 78(b), Plaintiffs' motion is denied.

### FACTUAL AND PROCEDURAL BACKGROUND

The Court recited the facts of this case in its opinion of March 20, 2013, ECF No. 33, so

only a brief version is recounted here. Widener Law School ("Widener" or "WLS") is based in

Wilmington, Delaware and has a satellite campus in Harrisburg, Pennsylvania. Am. Compl. ¶ 27,

ECF No. 8. Plaintiffs describe it as a "lower tier" law school with "one of the highest acceptance

rates in the country." *Id.* ¶¶ 31, 48. Plaintiffs are six Widener alumni who graduated between 2008

1

**NOT FOR PUBLICATION**

and 2011.[1] *Id.* ¶ 1. Claiming that their Widener law degrees did not lead to satisfactory legal employment, Plaintiffs allege on behalf of themselves and those similarly situated that Widener violated consumer fraud laws through a "practice of publishing and reporting misleading job placement and salary statistics" to "induce students to enroll and/or stay enrolled" at Widener and pay its "artificially inflated tuition." *Id.* ¶¶ 1, 17-18, 20, 22, 24-25.

Plaintiffs' claims arise from Widener's marketing materials and reporting practices between 2005 and 2011. They allege that Widener's website promised that "[a]s a graduate of Widener Law, you'll join a network of more than 12,000 alumni . . . using their Widener Law degrees to pursue successful, rewarding careers." *Id.* ¶ 3. Plaintiffs assert that Widener published statistics "on its website that led students to believe that WLS successfully placed over 90% of its graduates in positions that required or at least used a law degree within nine months of graduation," including the following statistics:

    a) "Graduates of the Class of 2004 had a 90% employment rate within nine months of graduation."

    b) "Graduates of the Class of 2005 had a 90% employment rate within nine months of graduation."

    c) "Graduates of the Class of 2007 had a 96% employment advanced degree rate within nine months of graduation."

    d) "Employment within nine months of graduation of over 91% for Class of 2008."

    e) "Employment within nine months of graduation of over 92% for Class of 2009."

    f) "Graduates of the Class of 2010 had a 93% employment/advanced degree rate within nine months of graduation."

---

[1] Plaintiffs are John Harnish, WLS Class of 2009, Justin Schluth, WLS Class of 2010, Robert Klein, WLS Class of 2009, Gregory Emond, WLS Class of 2011, Ayla O'Brien, WLS Class of 2008, and Christina Marinakis, WLS Class of 2010. Am. Compl. ¶¶ 17-25. Plaintiffs Edward Gilson, Megan Shafranski, and Robert MacFadyen have withdrawn from the litigation. ECF Nos. 19, 50, 65.

**NOT FOR PUBLICATION**

*Id.* ¶ 35.

Plaintiffs assert that these statistics were misleading because Widener did not disclose that the employment rates included "part time legal, law-related and non-legal positions," such that "a graduate could be working in *any* capacity in *any* kind of job, no matter how unrelated to law – and would be deemed employed and working in a career 'using' the WLS law degree." *Id.* ¶¶ 36-37 (emphasis in original). Among other things, Plaintiffs also allege that "WLS did not disclose that a sizeable percentage of WLS graduates did not respond to [its graduate employment surveys], when, presumably, a high percentage of those graduates were not placed successfully." *Id.* ¶ 36. Plaintiffs indicate that "in or about early 2012," Widener "took certain remedial measures" and modified its website to provide more specific employment data. *Id.* ¶ 47. After this update, the website stated:

> Graduates of the Class of 2010 had a 93% employment / advanced degree program participation rate. This rate includes full and part time legal, law-related and non-legal positions as well as advanced degree program participation within nine months of graduation. For more information, please download a comprehensive summary of employment statistics (PDF).

*Id.*

Beyond the website and other marketing materials, Plaintiffs also claim that Widener misled them by "reporting its misleading placement rates and salary statistics to third parties such as *U.S. News* and the ABA." *Id.* ¶ 38. Plaintiffs contend that Widener's employment statistics "helped to artificially boost WLS's *U.S. News* ranking because this data constitutes 18 percent . . . of a law school's ranking." *Id.* ¶ 39. Plaintiffs explain that this false reporting was detrimental because "prospective law students rely upon" the *U.S. News* rankings to make their law school decisions. *Id.* ¶ 40.

3

**NOT FOR PUBLICATION**

Plaintiffs' two causes of action allege that Widener violated the New Jersey and Delaware

Consumer Fraud Acts by engaging "in a pattern and practice of knowingly and intentionally

making numerous false representations and omissions of material facts, with the intent to deceive

and fraudulently induce reliance by Plaintiffs and the members of the Class." *Id.* ¶¶ 75, 90.

Specifically, Plaintiffs claim Widener violated the New Jersey and Delaware Consumer Fraud

Acts by making the following "false representations and omissions":

    a) Stating false placement rates during the recruitment and retention process, including that approximately 90-95 percent of WLS graduates secured employment within nine months of graduation;

    b) Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secure full-time, permanent employment for which a J.D. is required or preferred;

    c) Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

    d) Making deceptive and misleading statements, representations and omissions concerning WLS's reputation with potential employers;

    e) Making deceptive and misleading statements, representations and omissions concerning the value of a WLS degree;

    f) Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates can obtain gainful employment in their chosen field; and

    g) Causing students to pay inflated tuition based on materially misleading statements, representations and omissions, including, specifically that approximately 90-95 percent of WLS graduates secure gainful employment.

*Id.* Among other things, Plaintiffs seek injunctive relief against Widener's "fraudulent and

deceptive business practices" and "restitution and disgorgement . . . totaling $75 million," which

they contend is "the difference between the inflated tuition paid by Class members . . . and the true

value of a WLS degree." Pr. for Rel. ¶¶ 1, 3.

NOT FOR PUBLICATION

The Court denied Widener's motion to dismiss Plaintiffs' claims on March 20, 2013.

Opinion, ECF No. 33. Plaintiffs now move to certify the following class under Federal Rules of

Civil Procedure 23(a) and 23(b)(3):

> All persons who enrolled at Widener University School of Law and were charged
> full or part-time tuition within the statutory period for the six-year period prior to
> the date the Complaint in this action was filed through the date the Class is certified.

Pls.' Mem. 21, ECF No. 94-1. Widener opposes certification. Def.'s Opp., ECF No. 97.

## LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432

(2013) (internal quotation omitted). To obtain class certification, a plaintiff "must affirmatively

demonstrate his compliance" with the four requirements of Federal Rule of Civil Procedure 23(a)

and at least one of the provisions of Rule 23(b). *Id.* Under Rule 23(a), a class may be certified only

if:

> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or
> defenses of the class, and
>
> (4) the representative parties will fairly and adequately protect the interests of the
> class.

Fed. R. Civ. P. 23(a). These "four requirements—numerosity, commonality, typicality, and

adequate representation—effectively limit the class claims to those fairly encompassed by the

named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal

quotations omitted). Rule 23(b) sets out three additional provisions, at least one of which must be

satisfied. Here Plaintiffs invoke Rule 23(b)(3), which permits class certification when a court finds

**NOT FOR PUBLICATION**

that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

Actual, not presumed, conformance with the Rule 23 requirements is essential. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012). To that end, when evaluating a motion for class certification, a court "is obligated to probe behind the pleadings when necessary" and "conduct a rigorous analysis of the evidence in support of certification." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163, 174 (3d Cir. 2015), *as amended* (Apr. 28, 2015). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Dukes*, 131 S. Ct. at 2551. Where a party seeks class certification under Rule 23(b)(3), the court has a "duty to take a 'close look' at whether common questions predominate over individual ones." *Comcast*, 133 S. Ct. at 1432 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)).

## DISCUSSION

Plaintiffs argue that their proposed class meets the Rule 23(a) numerosity, commonality, typicality, and adequacy requirements as well as the Rule 23(b)(3) requirements of predominance and superiority. Pls.' Mem. 3, ECF No. 94-1. Defendant Widener contests certification, arguing that the proposed class does not satisfy Rule 23(b)(3). Defs.' Opp. 2, ECF No. 97. First, Widener contends that the proposed class is not readily ascertainable. Def.'s Opp. 16-17. Second, for several reasons, Widener argues that it does not meet the Rule 23(b)(3) predominance standard. *Id.* 17-43. Finally, Widener asserts that Plaintiffs fail to address necessary choice of law questions. *Id.* 43-45. Although Widener's arguments are focused, the Court must conduct rigorous analysis as to each Rule 23 requirement.

6

NOT FOR PUBLICATION

### 1. The Proposed Class Is Ascertainable

Widener argues that Plaintiffs' proposed class is not ascertainable. Def.'s Mem. 16. "A plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd*, 784 F.3d at 163. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Id.* (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). The ascertainability requirement "does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members can be identified.'" *Byrd*, 784 F.3d at 163 (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.2 (3d Cir. 2013)). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593.

Widener argues that the proposed class is not ascertainable because it is "overbroad," encompassing "individuals who were never exposed to the allegedly offending marketing materials, were not harmed and who have no legally cognizable claim under the NJCFA." Def.'s Opp. 16-17. Plaintiffs respond that available records "identify all enrolled, tuition paying students for the duration of the class period," thereby "readily identify[ing] every member" of the proposed class. Pls.' Reply 5, ECF No. 99.

The "ascertainability inquiry is narrow," and it "only requires the plaintiff to show that class members can be identified." *Byrd*, 784 F.3d at 165 (quoting *Carrera*, 727 F.3d at 308 n.2)). Plaintiffs' proposed class includes "[a]ll persons who enrolled in Widener University School of Law and were charged full or part-time tuition" within a specified period. Pls.' Mem. 21. This

7

**NOT FOR PUBLICATION**

definition has clear objective criteria: class members must have been (1) enrolled at Widener and

(2) charged tuition (3) during the set time frame. Widener's records provide a reliable and

administratively feasible way to identify every class member. No mini-trials will be necessary.

Whether the proposed class includes individuals who were not exposed to Widener's

alleged misrepresentations, or who were not harmed, is irrelevant for ascertainability. *See Byrd*,

784 F.3d at 167-68 (finding that district court "abused its discretion in determining that the

proposed classes were not ascertainable because they were 'overly broad'"); *Grandalski v. Quest*

*Diagnostics Inc.*, 767 F.3d 175, 184-85 (3d Cir. 2014) ("Our cases that have addressed

ascertainability have focused on whether objective records could readily identify class members.").

"To the extent Defendant[] meant to challenge any potential differences between the proposed

class representatives and unnamed class members, such differences should be considered within

the rubric of the relevant Rule 23 requirements—such as adequacy, typicality, commonality, or

predominance." *Byrd*, 784 F.3d at 169. Because each student who enrolled at Widener during the

class period can be identified, the proposed class is ascertainable.

### 2. Numerosity Is Satisfied

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1). There is "no minimum number of members needed for a

suit to proceed as a class action." *Marcus*, 687 F.3d at 595. Courts must examine "the specific facts

of each case," but "generally if the named plaintiff demonstrates that the potential number of

plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Id.* (citations omitted). Because

Plaintiffs' proposed class includes "thousands of former Widener students," Pls.' Mem. 23, the

numerosity requirement is satisfied.

8

NOT FOR PUBLICATION

### 3. The Commonality Requirement Is Satisfied But Predominance Is Not

Rule 23(a)(2) is satisfied because common questions exist among all proposed class members, but Rule 23(b)(3) is unmet because the common questions do not predominate over questions individual to class members.

Rule 23(a)(2) requires Plaintiffs to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 131 S.Ct. at 2551 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). To make this showing, class claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "For purposes of Rule 23(a)(2), even a single common question will do." *Id.* at 2556 (quotations and alterations omitted).

In a Rule 23(b)(3) class action, which Plaintiffs seek to bring here, common questions must not only exist but also predominate over questions affecting only individual class members. Fed. R. Civ. P. 23(b)(3). This predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. "To assess predominance, a court at the certification stage must examine each element of a legal claim 'through the prism' of Rule 23(b)(3)." *Marcus*, 687 F.3d at 600 (quoting *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630 (3d Cir. 2011)). A plaintiff must "demonstrate that [each] element of [each legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2009).

**NOT FOR PUBLICATION**

### a.  There Are Questions Common to the Proposed Class

Plaintiffs list a litany of questions which they claim are common to all proposed class members. These questions are whether:

> (1) Defendant inflated its graduate employment and salary statistics through improper collection processes;

> (2) Defendant inflated its graduate employment and salary statistics through improper aggregation methods;

> (3) Defendant disclosed disaggregated statistics in a way that was readily available to students;

> (4) a reasonable student who was exposed to Widener's misrepresentations would have believed that Widener's employment rate included temporary and non-legal jobs;

> (5) Widener knew that it was misleading students about its graduate employment rate and salary statistics; and

> (6) Widener was able to charge higher tuition based, in part, on its consistently inflated graduate employment statistics.

Pls.' Mem. 24-25. The Court need not analyze the commonality of each of these questions. The class claims proceed from a core common contention that Widener engaged in a consistent practice of disseminating misleading employment statistics to prospective and enrolled students. Pls.' Mem. 1-3. Resolving the truth or falsity of this common contention will drive resolution of this litigation as to all class members. The Rule 23(a)(2) commonality requirement is satisfied.

The Court's analysis does not end there, however, because common questions must also predominate over individual questions to warrant class certification under Rule 23(b)(3).

### b.  Common Questions Do Not Predominate Over Individual Questions

Plaintiffs have not established the predominance of common questions in this case. Plaintiffs bring claims for consumer fraud under the New Jersey Consumer Fraud Act and the Delaware Consumer Fraud Act. To establish predominance, Plaintiffs must show that each element

10

**NOT FOR PUBLICATION**

of their NJCFA and DCFA claims can be proven by "evidence that is common to the class rather than individual to its members." *Hydrogen Peroxide*, 552 F.3d at 311. One element that must be established for both an NJCFA claim and a DCFA claim is loss or damages. *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 389 (2007) (To state an NJCFA claim, plaintiff must allege "(1) unlawful conduct . . . ; (2) an ascertainable loss . . . ; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss."); *Yarger v. ING Bank, FSB*, 285 F.R.D. 308, 326 (D. Del. 2012) ("To prove a claim under the DCFA, a plaintiff must show: (1) that [the defendant's] advertisements contained a false representation and/or omitted a material fact; (2) that [the defendant] intended for Plaintiffs to rely on the representation or omission; and (3) damages."). Plaintiffs have not shown that they can prove the proposed class members' damages by common evidence.

Plaintiffs' theory of damages is that Widener's alleged misrepresentations inflated its tuition prices above what they should have been, and all Widener students suffered damages when they paid the extra, "inflated" tuition amount. Pls.' Mem. 17-18. Plaintiffs intend to prove damages on a classwide basis by using an expert statistical analysis to quantify the alleged tuition inflation. *Id.* at 18. They advance a regression analysis which, according to their expert, uses "data from 64 private law schools from the bottom two ranked tiers listed by *U.S. News & World Report*" to measure "the impact of employment rate on Widener's tuition prices while controlling for other factors." *Id.* From this analysis, Plaintiffs' expert concludes that "[t]o the extent that law school job placement statistics are overstated or inflated in publicly distributed information including advertisements and/or websites . . . they will be reflected in higher law school tuition costs for JD programs relative to tuition costs that reflect accurate job placement statistics." *Id.* at 19. In sum, Plaintiffs intend their expert's analysis to prove that all class members paid a certain extra amount

**NOT FOR PUBLICATION**

of tuition due to Widener's alleged misrepresentations about its graduates' employment success. This theory of common damages is unacceptable for two reasons.

First, Plaintiffs' theory that all Widener students sustained corresponding damages ignores the reality that many students obtained the full-time legal jobs they sought when enrolling at Widener and paying its tuition. The Court recognizes that Plaintiffs and other proposed class members may have experienced ascertainable losses as a result of Widener's alleged misrepresentations that they were highly likely to get full-time legal jobs. But other Widener students, whom Plaintiffs seek to include in the class, actually got the advertised jobs. Am. Compl. ¶ 47 (stating that 56% of 2010 graduates who responded to Widener's employment survey "were employed in full-time legal work"). The loss, if any, which those students may have experienced as a result of Widener's alleged misrepresentations is different from the loss incurred by students who did not obtain full-time legal employment. As such, individual questions predominate over common questions regarding the loss each proposed class member sustained.

Second, Plaintiffs' method of proving classwide damages relies on a "fraud on the market" theory which New Jersey courts have rejected outside the federal securities fraud context. In *International Union*, the New Jersey Supreme Court considered an argument nearly identical to Plaintiffs' argument here: that "defendant's marketing scheme created an effect on the price of Vioxx [a pharmaceutical] such that the ascertainable loss element of [the NJ]CFA may be proven, on a class-wide basis, by reliance on expert analysis alone." *Int'l Union*, 192 N.J. at 391. The Court rejected the plaintiff's attempt to prove common damages through expert price inflation analysis, finding that "rely[ing] on a single expert to establish a price effect in place of a demonstration of an ascertainable loss . . . would indeed be the equivalent of fraud on the market, a theory we have not extended to [NJ]CFA claims." *Id.* at 392.

**NOT FOR PUBLICATION**

Plaintiffs argue that their expert's analysis is acceptable because it "does not presuppose price inflation," but rather employs a regression analysis to identify "a significant, positive price relationship" between advertised employment rates and law school tuition levels. Pls.' Reply 13-14. Although multiple regression analysis is a viable method of economic analysis,[2] Plaintiffs' theory of damages still relies on a market dynamic that they have not proved to exist. Whereas securities markets are theorized to reflect material public information in security prices, Plaintiffs offer no evidence that a similar market dynamic adjusts law school tuition levels to reflect public disclosures about the schools' employment rates. *See In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, Civ. No. 06- 5774, 2009 WL 2043604, at *21 (D.N.J. July 10, 2009) ("Whereas the price of securities are set by the price at which buyers are willing to buy the securities and sellers are willing to sell, here, . . . Plaintiffs' theory of injury relies upon the faulty assumption that the prices of [pharmaceuticals] fluctuate in a similar manner"); *see also Kaufman v. i-Stat Corp.*, 165 N.J. 94, 113-18 (2000) (discussing the Efficient Capital Markets Hypothesis and declining to extend fraud on the market theory to New Jersey common law fraud actions).

As a means of identifying common damages, Plaintiffs' regression analysis depends on the assumption that law school tuition prices accurately reflect the schools' advertised employment rates. Pls.' Mem. 19. That is, the regression analysis purports to calculate ascertainable loss by identifying the difference between what Widener's tuition was with the alleged misrepresentations and what it would have been without them. The problem with this analysis is that Widener sets its tuition prices, not active traders in a market for seats in its classes. The regression analysis may

---

[2] Plaintiffs advance this Court's opinion in *In re Bulk (Extruded) Graphite Products Antitrust Litig.*, Civ. No. 02-6030 (WHW), 2006 WL 891362 (D.N.J. Apr. 4, 2006), in support of their attempt to prove common damages by regression analysis. This case does not aid Plaintiffs. It deals with measuring damages from an antitrust conspiracy and offers no support for applying a "fraud on the market" theory in a consumer fraud action alleging that misrepresentations caused price inflation.

13

NOT FOR PUBLICATION

show that without the alleged misrepresentations, according to prevailing law school tuition levels,

Widener *should* have had lower tuition prices, but it does not show that it *would* have had lower

tuition prices. Plaintiffs' regression analysis is insufficient to prove that the proposed class

members sustained common damages from Widener's alleged misrepresentations.[3]

Because Plaintiffs have not shown that the damages elements of their NJCFA and DCFA

claims can be established by common proof, Plaintiffs' proposed class cannot be certified under

Rule 23(b)(3).

### 4. Typicality Is Not Satisfied

Plaintiffs have also failed to demonstrate that the named plaintiffs' claims are "typical of

the claims . . . of the proposed class." Fed. R. Civ. P. 23(a)(3). "Typicality ensures the interests of

the class and the class representatives are aligned 'so that the latter will work to benefit the entire

class through the pursuit of their own goals.'" *Newton v. Merrill Lynch, Pierce, Fenner & Smith,*

*Inc.*, 259 F.3d 154, 182-83 (3d Cir. 2001), *as amended* (Oct. 16, 2001). "[T]he proper consideration

in assessing typicality [] include[s] three distinct, though related, concerns: (1) the claims of the

class representative must be generally the same as those of the class in terms of both (a) the legal

theory advanced and (b) the factual circumstances underlying that theory; (2) the class

representative must not be subject to a defense that is both inapplicable to many members of the

class and likely to become a major focus of the litigation; and (3) the interests and incentives of

the representative must be sufficiently aligned with those of the class." *In re Schering Plough*

*Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009). "[F]actual differences will not render a

claim atypical if the claim arises from the same event or practice or course of conduct that gives

---

[3] The Court acknowledges Plaintiffs' contention that "Widener has not produced any information
about tuition prices, how it sets those prices, or any Widener price analyses." Pls.' Reply 17. Such
information is relevant to class discovery and should be produced, if available, to aid Plaintiffs in
assessing whether putative class members' damages can be proved by common evidence.

**NOT FOR PUBLICATION**

rise to the claims of the class members, and if it is based on the same legal theory." *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006) (internal quotations omitted).

It is not clear that all members of the proposed class were exposed to the false representations or omissions Plaintiffs allege. Plaintiffs' core allegation is that Widener disseminated misleading employment statistics "between 2005 and 2011." Am. Compl. ¶ 5. The proposed class definition, however, includes Widener students who enrolled "through the date that this Class is certified," Pls.' Mem. 21, thereby including students who enrolled in 2012, 2013, and 2014. The amended complaint itself indicates that Widener changed its reporting of employment statistics "in or about early 2012" and published a "comprehensive summary" of employment data on its website. Am. Compl. ¶ 47. Because the factual circumstances underlying claims of students who enrolled at Widener after 2011 are markedly different from Plaintiffs' claims, Plaintiffs' claims are not typical of the class claims as a whole.

It is also possible that putative class members have interests which do not align with Plaintiffs' interests. Widener alumni who are pursuing legal careers in which their professional status is, to some degree, linked to the reputation of their law school may not want Widener to be held liable for violating consumer fraud laws. In other cases where a defendant's liability would benefit some class members but hurt the interests of others, courts have found class certification inappropriate. *See, e.g., Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988); *Phillips v. Klassen*, 502 F.2d 362, 366-67 (D.C. Cir. 1974).

**NOT FOR PUBLICATION**

## CONCLUSION

The Court need not address the other Rule 23 factors requisite to class certification.

Plaintiffs' motion is denied. An appropriate order follows.

Date: July 1, 2015

/s/ **William H. Walls**
United States Senior District Judge

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN HARNISH, et al., on behalf of themselves and all others similarly situated, | **ORDER** |
| Plaintiffs, | Civ. No. 12-00608 (WHW) (CLW) |
| v. | |
| WIDENER UNIVERSITY SCHOOL OF LAW, and DOES 1-20, | |
| Defendants. | |

**Walls, Senior District Judge**

It is on this ⁄th day of August, 2015:

ORDERED that Plaintiffs' motion for reconsideration is denied.

Hon. William H. Walls
United States Senior District Judge

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| JOHN HARNISH, et al., on behalf of themselves and all others similarly situated,<br><br>              **Plaintiffs,**<br><br>      v.<br><br>WIDENER UNIVERSITY SCHOOL OF LAW, and DOES 1-20,<br><br>              **Defendants.** | **OPINION**<br><br>Civ. No. 12-00608 (WHW) (CLW) |

**Walls, Senior District Judge**

Plaintiffs move for reconsideration of this Court's order of July 1, 2015, ECF No. 101, denying class certification in this consumer fraud action against Defendant Widener University School of Law ("Widener"). Without oral argument under Federal Rule of Civil Procedure 78(b), Plaintiffs' motion is denied.

**LEGAL STANDARD**

Local Civil Rule 7.1(i) allows a party to move for reconsideration within 14 days after the entry of an order, and directs the moving party to submit "[a] brief setting forth concisely the matter or controlling decisions which the party believes the Judge . . . has overlooked." L. Civ. R. 7.1(i). The Third Circuit has held that the "purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).

Reconsideration motions may not be used to relitigate old matters, nor to raise arguments or present evidence that could have been raised before the entry of judgment. *See* Charles A.

**NOT FOR PUBLICATION**

Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2810.1. Such motions will

only be granted where (1) an intervening change in the law has occurred, (2) new evidence not

previously available has emerged, or (3) the need to correct a clear error of law or prevent a

manifest injustice arises. *North River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir.

1995).

## DISCUSSION

In its opinion denying class certification, this Court did not overlook any settled law. Nor

did the Court overlook its earlier opinions, as Plaintiffs claim. Pls.' Mem. 5-8, ECF No. 104-1.

The Court has consistently recognized Plaintiffs' theory that they paid an "inflated" tuition due to

Widener's misrepresentations about its employment rates. *See* Op. on Mot. Dismiss 18, ECF No.

33; Op. on Mot. Recons. 7, ECF No. 43; Op. on Mot. Certif. 11-12, ECF No. 101. On Plaintiffs'

motion for class certification, the Court was required to decide whether Plaintiffs' proposed class

satisfied Federal Rule of Civil Procedure 23, and concluded that it did not. The Court's opinion

did not disregard Plaintiffs' theory that all proposed class members paid a falsely inflated tuition

price. Rather, the Court concluded that individual questions predominate over common questions

regarding the loss that each proposed class member sustained by paying Widener's allegedly

inflated tuition. Op. on Mot. Certif. at 12. Even if all proposed class members paid "inflated"

tuition—by paying a premium for overstated job placement rates—the fact remains that some

proposed class members got what they paid for. *Id.* They obtained the full-time legal jobs for which

they paid tuition, whether it was inflated or not. Their loss, if any, was different from that of

students who paid the allegedly inflated tuition and did not obtain full-time legal employment.

Individual questions predominate as to class members' ascertainable losses, and Rule 23(b)(3) is

unmet.

**NOT FOR PUBLICATION**

Plaintiffs' other arguments for reconsideration are also meritless. Plaintiffs' proposed method of proving all class members' ascertainable losses by common expert analysis has been rejected by the New Jersey Supreme Court. *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 391-93 (2007). And this Court did not overlook the alleged facts regarding Widener's post-2011 data collection practices or misrepresentations. There has been no intervening change in the law, and no new evidence not previously available has emerged. Plaintiffs did not present anything in the motion for reconsideration that they did not present before—nothing is being said now that was not said then. As a result, this motion for reconsideration is denied. *See North River Ins. Co.*, 52 F.3d at 1218; *Max's Seafood Cafe*, 176 F.3d at 677; *Buffa v. N.J. State Dep't of Judiciary*, 56 Fed. App'x 571, 575 (3d Cir. 2003); *Gutierrez v. Ashcroft*, 289 F. Supp. 2d 555, 561 (D.N.J. 2003).

## CONCLUSION

Plaintiffs' motion for reconsideration is denied. An appropriate order follows.

Date: August ⁄⁄, 2015

Hon. William H. Walls
United States Senior District Judge

3

No. 15-8086

AUG 19 2015

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

| | |
|---|---|
| JOHN HARNISH, et al., on behalf of themselves and all others similarly situated, | Petition for Rule 23(f) Appeal from the United States District Court for the District of New Jersey |
| **Plaintiffs/Petitioners,** | |
| v. | Civil Action No. 12-608 |
| WIDENER UNIVERSITY SCHOOL OF LAW, and DOES 1-20, | Hon. William H. Walls, U.S.D.J. Hon. Cathy L. Waldor, U.S.D.J |
| **Defendants/Respondents.** | |

## PLAINTIFFS' PETITION FOR LEAVE TO APPEAL
## PURSUANT TO FED. R. CIV. P. 23(f)

David S. Stone
David B. Harrison
Danielle F. Moriber
Carolyn B. Rendell
**STONE & MAGNANINI LLP**
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (908) 464-3010

*Attorneys for Plaintiffs/Petitioners*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ii

Introduction and Facts Necessary to Understand the Question Presented ..................1

RELIEF REQUESTED ................................................................................7

QUESTIONS PRESENTED ..........................................................................7

REASONS WHY THIS APPEAL SHOULD BE ALLOWED..................................7

    I.    This Court Should Graft Review Under Rule 23(f) ..............................7

    II.   The District Court Made a Mistake of Fact and Law by Disregarding
         the Law of the Case and Plaintiffs' Theory as Alleged ..........................9

    III.  The District Court Incorrectly Likened Plaintiffs' Damages Model to
         a Fraud on the Market Theory ................................................................11

    IV.  The District Court Erroneously Found that Typicality was not
         Satisfied ..............................................................................................17

CONCLUSION ....................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Bieneman v. City of Chicago,*
  864 F.2d 463 (7th Cir. 1988) ............................................................. 19

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426, 1430, 185 L. Ed. 2d 515 (2013) ............................... 11

*Erica P. John Fund, Inc. v. Halliburton Co.,*
  131 S. Ct. 2179 (2011) ....................................................................... 12

*Gooch v. Life Investors Ins. Co.,*
  672 F.3d 402 (6th Cir. 2012) ............................................................. 19

*Guttierez v. Johnson & Johnson,*
  523 F.3d 187 (3rd Cir. 2008) ............................................................... 8

*Hayman Cash Register Co. v. Sarokin,*
  669 F.2d 162 (3d Cir. 1982) ................................................................. 9

*In re Ford Motor Co. E-350 Van Prods.,*
  2008 U.S. Dist. LEXIS 73690 (D.N.J. Sept. 3, 2008) ................... 12, 13

*In re Hydrogen Peroxide Antitrust Litig.,*
  552 F.3d 305 (3d Cir. 2008) ................................................ 10, 11, 12

*In re Intel Corp. Microprocessor,*
  2010 U.S. Dist. LEXIS 144511 (D. Del. July 28, 2010) ..................... 15

*In re Neurontin Antitrust Litig., MDL,*
  No. 1479, 2011 U.S. Dist. LEXIS 7453 (D.N.J. Jan. 25, 2011) ......... 17

*In re Neurontin Mktg. & Sales Practices Litig.,*
  712 F.3d 60 (1st Cir. 2013) ................................................................ 16

*In re Newsday Litig.,*
  No. 08-MC-096, 2008 WL 2884784 (E.D.N.Y. July 23, 2008) ......... 16

*In re Philips/Magnavox TV Litig.,*
  Civ. No. 09-3072, 2012 U.S. Dist. LEXIS 67287 (D.N.J. May 14, 2012) ........ 11

*In re Warfarin Sodium Antitrust Litig.,*
  391 F.3d 516 (3d Cir. 2004) ............................................................... 11

*International Union of Operating Eng'rs v. Merck & Co.,*
  192 N.J. 372 (2007) ...................................................................... 12, 13

*Marcus v. BMW North America LLC,*
    687 F 3d 583 (3rd Cir. 2011) ........................................................ 19

*Marcus v. BMW of N. Am., LLC,*
    687 F.3d 583 (3d Cir. 2012) ......................................................... 12

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    259 F.3d 154 (3d Cir. 2001) ........................................................... 8

*Pennsylvania Emp. Benefit Trust Fund v. Zeneca, Inc.,*
    710 F. Supp. 2d 458 (D. Del. 2010) ............................................ 12

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,*
    998 F.2d 1224 (3d Cir. 1993) ....................................................... 15

*Phillips v. Klassen,*
    502 F.2d 362 (D.C. Cir. 1974) ...................................................... 19

*Saini v. BMW of N. Am.,*
    Civ. No. 12-6105, 2015 U.S. Dist. LEXIS 66242 at *9 (D.N.J. May 21,
    2015) ............................................................................................. 19

*Zenith Elec. Corp. v. WH-TV Broad. Corp.,*
    395 F.3d 416 (7th Cir. 2005) ....................................................... 15

**Rules**

Fed. R. Civ. P. 23(f) ........................................................................... 8

Pursuant to Federal Rule of Civil Procedure 23(f), Plaintiffs John Harnish, Justin Schluth, Robert Klein, Gregory Emond, Ayla O'Brien Kravitz, and Christina Marinakis (collectively "Plaintiffs"), petition this Court for leave to appeal the July 1, 2015 Opinion and Order of the United States District Court for the District of New Jersey denying class certification (Exhibit A). Plaintiffs also seek leave to appeal from the Order and Opinion of the District Court denying reconsideration of same entered on August 5, 2015 (Exhibit B).

**Introduction and Facts Necessary to Understand the Question Presented**

This action, brought under the New Jersey Consumer Fraud Act ("NJCFA") and Delaware Consumer Fraud Act ("DCFA"), involves the reporting and publication of misleading employment statistics by Defendant Widener University School of Law ("Widener"). Plaintiffs allege that from 2005 through 2011, Widener misled prospective and enrolled students by reporting employment rates between 90% and 97%, and engaging in a mass-marketing campaign that used those employment rates and median salary figures to induce prospective students to enroll at Widener and convince enrolled students to stay.

Widener inundated these legal education consumers with its near-perfect placement rate, bolding it on mass mailings, prominently displaying it on school message boards, publishing it on its website, and repeating it over and over again in presentations and speeches at open school events. The combined effect of these

1

promotions was to lead students to believe that Widener had tremendous success in placing its graduates in valuable legal careers within nine months of graduation. Indeed, Widener told students that its "95% employment rate says it all." In reality, Widener was unsuccessful at placing students in valuable positions that required or even preferred a law degree. Widener's employment rate included all types of non-legal and part-time positions for which a law degree provides no tangible benefit. With these facts in mind at the pleading stage, the District Court recognized that prospective students may have reasonably believed that Widener's published employment rate did not include part-time, and non-legal positions.

Following the pleadings stage, class discovery revealed that Widener not only inflated its employment rate with non-legal and/or part-time positions, but that it employed dubious employment data collection strategies. Widener instructed its data collection staff, career and admissions administrative personnel, to fill out Widener graduate surveys without the graduates' authorization, using second-hand and third-hand information from various unreliable and outdated Internet sources. Additionally, discovery revealed that Widener directed these staff members to forge surveys only for *employed* graduates, skewing the results in favor of a higher percentage of employed students and directly leading to a significant employment rate bias.

2

In 2011, after years of reporting employment rates above 90%, exceeding the rates of some of the best law schools in the country, Widener finally revealed that it was actually placing students in full-time legal positions far below the reported rate. However, even that disclosed employment rate, as revealed through discovery, is significantly inflated by Widener's questionable collection practices.

In denying Widener School of Law's ("Widener") motion to dismiss and its subsequent motion for reconsideration in 2013, the District Court correctly recognized and rejected Defendant's repeated assertions that Plaintiffs' claims are connected to Widener students' ability to obtain post-graduate employment. Indeed, as the District Court explained then: "Widener mischaracterizes Plaintiffs' Amended Complaint. The claimed causal connection is between the allegedly misleading statements and Plaintiffs' inducement to buy legal education from Widener, not whether Plaintiffs received a legal job." (CM/ECF No. 33 at 19).

On February 2, 2015, Plaintiffs moved to certify the following class:

> All persons who enrolled in Widener University School of Law and were charged full or part-time tuition within the statutory period for the six-year period prior to the date the Complaint in this action was filed through the date that this Class is certified.

(Ex. A at 5). The District Court's denial of class certification on July 1, 2015 rested on mistakes of fact and of law which directly contradict its previous Opinions, as well as evidence obtained through class discovery. Further, the denial relied heavily upon a new theory of the case never alleged by Plaintiffs, but advanced by

Defendant and previously rejected by the Court in denying Defendant's motion to dismiss. Plaintiff sought reconsideration, which was denied on August 5, 2015 with little analysis.

Based upon the actual theory alleged by Plaintiffs, class action treatment is appropriate in this case. As found by the District Court at the pleading stage, Plaintiffs' ascertainable loss is the increment in tuition paid by class members due to Widener's fraudulent post-graduate employment statistics (CM/ECF Nos. 33, 43). The sole ascertainable loss Plaintiffs allege and seek to recover is the increased tuition that all members of the class were required to pay during the relevant time period as a result of Widener's fraudulent representation of placement statistics. That loss is the difference between tuition that Widener's students paid and tuition that they would have paid in the absence of the false and misleading placement statistics, since students do not negotiate the price of tuition, it is determined by the demand in the marketplace. That number is ascertainable on a class-wide basis and not specific to individual class members.

At the motion to dismiss phase, the District Court recognized and explained that Plaintiffs' theory regarding ascertainable loss has nothing to do with whether or not a Widener graduate actually obtained an advertised job - students paid inflated tuition from the time they enrolled regardless of post-graduate employment success. (CM/ECF Nos. 33, 43). This is now law of the case.

4

Accordingly, it was a mistake of fact and plain error to conclude that an individual's post-graduation employment success destroys predominance.

Similarly, the District Court made a clear factual error when it accepted Defendants' mischaracterization of Plaintiffs' damages theory as "fraud on the market." Fraud on the market theory permits a presumption of reliance in securities cases based on the assumption that a perfectly functioning market incorporates all available information, including misrepresentations involving stock prices. Here, however, Plaintiffs do not seek to use fraud on the market theory as a substitute for proving reliance, as reliance is not an element of any of their claims. Moreover, Plaintiffs do not assert that law schools operate in a perfectly functioning market, or even that tuition price reflects all of the elements of what law school offers.

Rather, using a widely accepted statistical methodology, Plaintiffs' model shows that had Widener reported its actual placement rate to students, it could not charge the same price, and maintain its enrollment levels. This is because similarly ranked schools with the same actual employment rate charged lower tuitions. Thus, while Plaintiffs assert that tuition price is subject to some market forces, they do not assert that they operate in a perfectly functioning market or rely on fraud on the market to show class wide damages or causation. The manner in which Plaintiffs propose to demonstrate damages on a class-wide basis is through what the District Court agreed is an authoritative and generally accepted method of economic

analysis, i.e. regression analysis. What Defendant and the District Court fail to recognize is that Plaintiffs' regression analysis establishes two critical facts here: (1) an actual loss, because, taking into account all other facts that affect tuition, Widener's tuition would have had to be lower for it to stay in business if it properly reported considerably lower placement results; and (2) that this loss is ascertainable, i.e., the precise difference between what Widener did charge and what it could have charged in the absence of fraud is ascertainable within a reasonable degree of certainty. Plaintiffs do not seek to recover for any other losses.

Further, in denying certification on typicality grounds, the District Court failed to account for the facts learned in discovery regarding Widener's unscrupulous data collection practices, supported by evidence in the record, which enabled it to continue to misrepresent its true placement rate well beyond 2011. Had the District Court taken into account Widener's continued misrepresentation, it would have concluded that the claims of all class members are typical. Finally, the Court also stated that the interests of the class members might not be aligned due to potential secondary reputational harm to the school which could to some degree impact Widener alumni. The suggestion that this indeterminate, ancillary harm might destroy typicality is, however, inconsistent with the "low threshold" the Third Circuit has set for finding that the typicality standard has been met.

## RELIEF REQUESTED

Plaintiffs respectfully request that this Court grant this petition to appeal pursuant to Federal Rule of Civil Procedure 23(f), reverse the Orders of the District Court (Exs. A and B), and order the District Court to certify the class, as Plaintiffs have made a sufficient showing that class treatment is appropriate.

## QUESTIONS PRESENTED

Should this Court grant leave to appeal, pursuant to Federal Rule of Civil Procedure 23(f), where the District Court: (1) misapplied law and fact in relying on what it previously rejected as a mischaracterization of Plaintiffs' case; (2) misapplied law and fact in equating Plaintiffs' experts' model with a "fraud on the market" theory; (3) disregarded factual evidence obtained through class discovery of Widener's ongoing fraudulent collection and reporting of graduate employment statistics; (4) relied on speculation and conjecture absent from the Record, suggesting that certain class members might have conflicting interests because they would benefit from Widener's fraud; and (5) denied class certification in a manner which results in the death knell for the consumer fraud claims of thousands of its students who were injured by Widener's conduct.

## REASONS WHY THIS APPEAL SHOULD BE ALLOWED

### I.   This Court Should Grant Review Under Rule 23(f)

7

"Courts of appeals are afforded wide latitude as permission to appeal may be granted or denied on the basis of any consideration that the Court of appeals finds persuasive." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165 (3d Cir. 2001) (internal quotation omitted). "If granting the appeal, however, would permit us to address (1) the possible case-ending effect of an imprudent certification decision (the decision is likely dispositive of the litigation); (2) an erroneous ruling; or (3) facilitate development of the law on class certification, then granting the motion would be appropriate." *Id.*

Here, as discussed in detail below, review will permit this Court to address the District Court's erroneous rulings and facilitate the clarification and development of the law on class certification.[1] In addition, appellate review is necessary because the Orders at issue effectively terminate the litigation. Plaintiffs relatively small individual damages make bringing individual claims impracticable due to the prohibitive cost of individual litigation. It is economically infeasible for Plaintiffs to litigate their individual claims to final judgment on the merits before having the opportunity to appeal the District Court's Orders. Moreover, as discovery in this matter has been bifurcated between class and merits, each individual Plaintiff would need to conduct their own merits and damages discovery

---

[1] The instant Petition is timely, as it has been filed within 14 days of the entry of the Order denying reconsideration. *Guttierez v. Johnson & Johnson*; 523 F.3d 187, 193 n.4 (3d Cir. 2008); Fed. R. Civ. P. 23(f).

8

and hire their own experts. Given the expense of such an undertaking and the comparatively small amount of individual damages, denial of interlocutory review would foreclose any possible appellate review of class certification issues and deny Plaintiffs any viable means of seeking redress.

## II.     The District Court Made a Mistake of Fact and Law by Disregarding the Law of the Case and Plaintiffs' Theory as Alleged

In March and May of 2013, the District Court denied Widener's motion to dismiss and motion for reconsideration, and affirmatively rejected Defendant's mischaracterization that Plaintiffs' case related to the procurement of post-graduate employment. (CM/ECF Nos. 33 at 18-20, No. 43 at 5). In fact, the District Court held that postgraduate employment was irrelevant to Plaintiffs' theory of ascertainable loss. That issue is now correctly and conclusively decided.

Unless a party timely moves for reconsideration, "[u]nder the law of the case doctrine, once an issue is decided, it will not be re-litigated in the same case, except in unusual circumstances." *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir. 1982) (citing 1B J. Moore, Federal Practice P 0.404(1) (1980)). This well established doctrine "expresses the practice of courts generally to refuse to reopen what has been decided." *Id.* at 169. Notwithstanding, the District Court reversed its course in denying class certification, this time apparently agreeing with Widener that Plaintiffs' theory of the case depended, at least in part, on whether a class member obtained post-graduate employment. (Ex. A at 12). Specifically, the

9

District Court reasoned that "Plaintiffs' theory that all Widener students sustained corresponding damages ignores the reality that many students obtained the full-time legal jobs they sought when enrolling at Widener and paying its tuition." (*Id*). This directly conflicts with the law of the case as decided by the District Court in rightly holding that Plaintiffs state a claim.

As the District Court correctly stated in its previous Opinion denying Widener's motion to dismiss, the misleading inquiry proffered by Widener is entirely distinct from and unrelated to Plaintiffs' claim. "Widener mischaracterizes Plaintiffs' Amended Complaint. The claimed causal connection is between the allegedly misleading statements and Plaintiffs' inducement to buy legal education from Widener, not whether Plaintiffs received a legal job." (CM/ECF No. 33 at 19; *see also* No. 33 at 18 (chastising Widener for its mischaracterizations)).   As the District Court correctly explained at the pleading stage, "[h]ere, Plaintiffs allege the loss occurred when they purchased a Widener education under false pretenses for a price higher than they would have if they had known Widener's more accurate employment rate." (CM/ECF No. 43 at 7).   According to a plain reading of the FAC, Plaintiffs' theory is that *all* students who paid tuition during the relevant period suffered the same injury when they paid fraudulently inflated tuition. Under this theory, Plaintiffs' claim is "susceptible to proof at trial through available evidence common to the class." *In re Hydrogen Peroxide Antitrust Litig.*,

10

552 F.3d 305, 325 (3d Cir. 2008). "The Third Circuit has repeatedly held that predominance exists where proof of liability depends on the conduct of the defendant." *In re Philips/Magnavox TV Litig.*, Civ. No. 09-3072, 2012 U.S. Dist. LEXIS 67287 (D.N.J. May 14, 2012) (citing *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298-301 (3d Cir. 2011)). Similarly, allegations of a purely economic loss support a finding of predominance. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004). Here, individual issues do not predominate since Plaintiffs' claims focus exclusively on Widener's conduct, namely its artificial inflation of employment statistics to charge higher tuition. Issues of individual post-graduate employment outcomes have no bearing on Plaintiffs' claims on a class-wide basis or otherwise and, accordingly, cannot destroy predominance.[2] Therefore, the District Court erred by resting its decision on a mischaracterization of Plaintiffs' allegations and the law of the case.

### III. The District Court Incorrectly Likened Plaintiffs' Damages Model to a Fraud on the Market Theory

For class certification, Plaintiffs must only show that their theory is "susceptible to proof at trial through available evidence common to the class."

---

[2] Although the Supreme Court's holding in *Comcast Corp. v. Behrend* requires that a plaintiff's proposed damages methodology be tied to its theory of liability, it does not require that a plaintiff present damages models consistent with every possible theory of liability, particularly theories that a plaintiff never alleged. 133 S. Ct. 1426, 1430, 185 L. Ed. 2d 515 (2013). Accordingly, the existence of other theories, such as the straw man involving post-graduate employment success advanced by Widener, does not present a basis for denying class certification.

11

*Hydrogen Peroxide*, 552 F.3d at 311. Plaintiffs met that burden. However, Defendants' mischaracterization of Plaintiffs' damages model, labeling it "fraud on the market," led the District Court to consider and rule on a case not before it. This Court should review the District Court's interpretation of the model which resulted in an erroneous finding regarding predominance.

Plaintiffs' method of proving class-wide damages is not a "fraud on the market" theory. A "fraud on the market" theory is used in securities fraud cases to establish a rebuttable presumption of reliance, namely, that an "investor relies on public misstatements whenever he buys or sells stock at the price set by the market." *Erica P John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2185 (2011) (internal quotation omitted); *Int'l Union of Operating Engineers v. Merck & Co.*, 192 N.J. 372, 392 (2007); *In re Ford Motor Co. E-350 Van Prods.*, 2008 U.S. Dist. LEXIS 73690, at *86 ("In other words, a party pursues fraud on the market, or 'price inflation theory,' when it alleges that 'the fact of advertising the products caused the prices to rise both for the ones that are effective and for these, allegedly ineffective products as well."). However, neither the NJCFA nor the DCFA require Plaintiffs to show reliance in proving their claims. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 606 (3d Cir. 2012) ("Importantly, unlike common law fraud, the NJCFA does not require proof of reliance."); *Pennsylvania Employee, Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 471 (D. Del. 2010) ("Courts

12

consistently have recognized that reliance is not a required element in establishing a claim under the DCFA.").

The District Court relied on *Merck*, a case that involves experts who used a price inflation theory in the absence of a regression analysis and without supporting evidence of causation. 192 N.J. at 392. There, plaintiff class admittedly was not misled by defendant's fraud, but claimed they were impacted by higher prices that resulted from defendant's civil RICO scheme. That case is inapposite here where Plaintiffs demonstrate causation on a class-wide basis through Plaintiffs' exposure to Widener's widespread affirmative misrepresentations and material omissions, and evidence adduced in discovery that Widener promoted, highlighted and purposely perverted its data collection process, indicating that it believed placement rates were a substantial factor as well, none of which was questioned by the Court. *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, Civ. No. 03-4558, 2008 U.S. Dist. LEXIS 73690, at *86-87 (D.N.J. Sept. 3, 2008).

Moreover, Dr. Martin's report *tests* whether placement statistics affect tuition price, without presupposing such a relationship. His preliminary results show a significant, positive price relationship capable of common proof; however, as the Court bifurcated discovery, Dr. Martin had no need to reach a precise damages figure, as Widener withheld tuition information under the bifurcation order.

-Ja39-

Furthermore, contrary to fraud on the market theory, Plaintiffs' model does not rely on a perfectly functioning market as asserted by the District Court. The District Court incorrectly explained that while Plaintiffs' regression analysis "may show that without the alleged misrepresentations . . . Widener *should* have had lower tuition prices, . . . it does not show that it *would* have had lower tuition prices." (Ex. A at 13-14). However, Plaintiff's analysis does in fact demonstrate that, in the absence of higher employment statistics, Widener *would have had to* lower its tuition prices, or it could not have stayed in business. So, although it is true that Widener *could* have simply decided to fold, *it did not* choose to do so, but instead chose to inflate its employment statistics. Plaintiffs model relies on the practical reality that some market forces effect law school tuition prices. Thus, under Plaintiffs' theory, if a student has a choice between two similarly ranked schools with the same employment rate, controlling for other relevant factors, he or she will choose the school with a lower tuition price. By increasing its employment rate statistics, Widener was able to charge a higher tuition. Accordingly, Widener's higher reported employment rate allowed it to maintain enrollment.

Here, Plaintiffs seek the "difference between the inflated tuition paid by Class members based on the material misrepresentations that approximately 90-95 percent of graduates are employed within nine months of graduation and the true value of a Widener law degree." (Am. Compl. ¶ 90). Accordingly, Dr. Martin built

-Ja40-

a statistical regression model using similar schools, and controlling for a number of variables such as location and number of full-time students, to determine with a reasonable degree of certainty what Widener could have charged in the absence of its inflation of graduate employment statistics.[3] *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1238 (3d Cir. 1993); *In re Intel Corp. Microprocessor*, 2010 U.S. Dist. LEXIS 144511 (D. Del. July 28, 2010) (Regression analysis is generally accepted to assess impact at class certification); *Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("[S]ocial science has tools to isolate the effects of multiple variables and determine how they influence one dependent variable . . . . Perhaps the leading tool is the multivariate regression . . . . Regression analysis is common enough in litigation to earn extended treatment in the Federal Judicial Center's *Reference Manual on Scientific Evidence* (2d ed. 2000)").

As with all schools, it is undeniable that Widener competes for law students with other similarly situated law schools by advertising or publically communicating to potential students the features of the school that it believes will influence decision making by applicants and, indeed discovery revealed such is the case. (CM/ECF No. 93, Exs. 1-2, 8). Dr. Martin analyzed the

---

[3] As indicated by Dr. Martin, some of these variables and specifications may change once merits discovery is complete and plaintiffs gain full access to merits discovery, as well as the discovery that the District Court ordered Widener to provide over its repeated objection thus far. (Ex. A at 14 n.3).

tuitions of over 60 law schools, including Widener's, as well as other characteristics, and built a statistical model in accordance with a widely accepted methodology. *See e.g. In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 60, 68-69 (1st Cir. 2013); *In re Newsday Litig.*, No. 08-MC-096, 2008 WL 2884784, at *7-9 (E.D.N.Y. July 23, 2008).

Here, Dr. Martin's model shows that tuition varies directly (and significantly) with the ranking of the school and the reported employment experience of its graduates, together with other identifying characteristics, such as location and class size. (CM/ECF No. 93, Ex. 56). Controlling for other factors, a potential law school candidate would not be willing to pay the same tuition to secure a law school degree that gave them a 50-70% chance of securing employment as a professional in the law industry – the likely actual post-graduate employment rate – than if that chance were above 90% as disseminated in Widener's inflated employment statistics. Dr. Martin's analysis demonstrates that had Widener advertised the true full time employment experience of its graduates, it could not have sustained its enrollment numbers, and the drop in enrollment would have been statistically significant enough that Widener would have been unable to compete in the law school market. This is not a fraud on the market theory. It merely asserts that some market forces determine how a school sets its tuition, (such that, for example, a school could not simply double its tuition

16

without increasing the quality of the institution in some area), and that a statistically significant positive relationship exists between the employment rate and tuition prices.

"At the class certification stage, plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class," but, instead, "they need only show that a viable method is available to prove damages on a class-wide basis." *In re Neurontin Antitrust Litig.*, MDL No. 1479, 2011 U.S. Dist. LEXIS 7453, at *9 (D.N.J. Jan. 25, 2011). Dr. Martin's model shows that tuition varies directly with the reported graduate employment rates of Widener's similarly situated competitors and that Widener behaves as if its published employment statistics along with other information it supplies will have an effect on the decisions of potential students to apply. Accordingly, while Dr. Martin's methodology asserts that tuition prices are subject to some market dynamics, it does not rely on a fraud on the market model. Dr. Martin's methodology, therefore, can be used to accurately calculate damages on a class wide basis.

## IV.    The District Court Erroneously Found that Typicality was not Satisfied

In deciding that "[i]t is not clear that all members of the proposed class were exposed to the false representations or omissions Plaintiffs allege," the District Court erred by disregarding evidence of Widener's Post-2011 misrepresentations revealed through discovery. (Ex. A at 15). While the Amended Complaint alleges

17

that Widener revealed a comprehensive summary of employment data in or about early 2012, Plaintiffs have established that Widener continues to misrepresent the true employment rate through unscrupulous data collection practices, including "capturing" only survey responses from employed students and changing graduate survey responses without verification or authorization. (Ex. A at 10-16). Specifically, the record shows that Widener instructed its staff to target and "achieve a higher capture rate" for students employed after graduation because it "doesn't help if those you capture are unemployed." Its staff followed those instructions, among other ways, by filling out student surveys as "employed" based on Internet and social media searches, without the knowledge or authorization of the so-called survey-respondents, and without validating the accuracy of the purported survey responses. These practices skewed Widener's data collection toward higher employment rates. The continued exposure to misrepresented employment data demonstrates, based on Plaintiffs actual damages theory, that there is no distinction between the exposure of the pre- and post- 2011 students. Because Plaintiffs' damages model involves only the incremental difference in the published employment rate and actual employment rate, the claims of all Widener students throughout the class period are typical.

In addition, the District Court noted that it is "possible" that some putative class members "might" have interests that would not align with those of Plaintiffs

18

as a determination that Widener is liable might further damage the reputation of the law school. The desire of some class members to participate in the class action is purely speculative and does not, as a matter of law, demonstrate that the interests of these class members are not sufficiently aligned with those of others.

In analyzing typicality, courts must look to whether the interests of the class representatives are "markedly" or "significantly" different from those of other plaintiffs in material respects. *Marcus v. BMW North America LLC*, 687 F 3d 583, 598 (3rd Cir. 2011); *Gooch v. Life Investors Ins. Co.*, 672 F.3d 402, 429 (6th Cir. 2012). The Third Circuit has set "a low threshold for satisfying typicality," which is generally established if the class members have similar claims involving the same conduct by the defendants. *Saini v. BMW of North America*, Civ. No. 12-6105, 2015 U.S. Dist. LEXIS 66242 at *9 (D.N.J. May 21, 2015). Typicality does not require that all class members have identical claims. *Id.*

Finally, this matter is factually distinguishable from those relied on by the District Court because *all* putative class members have indeed suffered the damages alleged by Plaintiffs and, accordingly, "significant antagonism" simply does not exist here. *See c.f. Phillips v. Klassen*, 502 F. 2d 362 (D.C. Cir. 1974) (interests were "in significant part" antagonistic to the other former employees who would in no way benefit if their payments and their retirement status were retrospectively voided); *see also c.f. Bieneman v. City of Chicago*, 864 F. 2d 463

(7th Cir. 1988) ("airport noise" case where many of the putative class members "undoubtedly derived great benefit" from being near a transportation hub because among other reasons it could increase property value). Surely finding any possible reason that some class members might potentially prefer not to pursue a lawsuit against the accused party to be a bar to certification (in this case, because some members might prefer that the fraud be perpetuated), would render any pursuit of certification futile. Therefore, this Court should grant review to address an erroneous ruling and facilitate development of the law on class certification.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant Plaintiffs' petition for appeal pursuant to 23(f), reverse the District Court's Class Certification and Reconsideration Decision, and Order the District Court to certify the class.

Dated:        August 19, 2015                Respectfully submitted,


STONE & MAGNANINI LLP

By:_____
        David S. Stone
        David B. Harrison
        Danielle F. Moriber
        Carolyn B. Rendell
    150 JFK Parkway, 4th Floor
    Short Hills, NJ 07078
    Tel: (973) 218-1111
    Fax: (973) 218-1106


20

dstone@stonemagnalaw.com
dharrison@stonemagnalaw.com
dmoriber@stonemagnalaw.com
crendell@stonemagnalaw.com


*Attorneys for Plaintiffs*

21

# EXHIBIT A

NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOHN HARNISH, et al., on behalf of themselves and all others similarly situated, | **OPINION** |
| Plaintiffs, | |
| v. | Civ. No. 12-00608 (WHW) (CLW) |
| WIDENER UNIVERSITY SCHOOL OF LAW, and DOES 1-20, | |
| Defendants. | |

### Walls, Senior District Judge

Plaintiffs are alumni of Widener Law School who allege that the school violated consumer fraud statutes by misrepresenting the employment success of its graduates. Plaintiffs filed a class action complaint on behalf of themselves and similarly situated former Widener Law School students. They now seek the Court's certification of their proposed class under Federal Rules of Civil Procedure 23(a) and 23(b)(3). Decided without oral argument under Federal Rule of Civil Procedure 78(b), Plaintiffs' motion is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court recited the facts of this case in its opinion of March 20, 2013, ECF No. 33, so only a brief version is recounted here. Widener Law School ("Widener" or "WLS") is based in Wilmington, Delaware and has a satellite campus in Harrisburg, Pennsylvania. Am. Compl. ¶ 27, ECF No. 8. Plaintiffs describe it as a "lower tier" law school with "one of the highest acceptance rates in the country." *Id.* ¶¶ 31, 48. Plaintiffs are six Widener alumni who graduated between 2008

1

**NOT FOR PUBLICATION**

and 2011.[1] *Id.* ¶ 1. Claiming that their Widener law degrees did not lead to satisfactory legal employment, Plaintiffs allege on behalf of themselves and those similarly situated that Widener violated consumer fraud laws through a "practice of publishing and reporting misleading job placement and salary statistics" to "induce students to enroll and/or stay enrolled" at Widener and pay its "artificially inflated tuition." *Id.* ¶¶ 1, 17-18, 20, 22, 24-25.

Plaintiffs' claims arise from Widener's marketing materials and reporting practices between 2005 and 2011. They allege that Widener's website promised that "[a]s a graduate of Widener Law, you'll join a network of more than 12,000 alumni . . . using their Widener Law degrees to pursue successful, rewarding careers." *Id.* ¶ 3. Plaintiffs assert that Widener published statistics "on its website that led students to believe that WLS successfully placed over 90% of its graduates in positions that required or at least used a law degree within nine months of graduation," including the following statistics:

a) "Graduates of the Class of 2004 had a 90% employment rate within nine months of graduation."

b) "Graduates of the Class of 2005 had a 90% employment rate within nine months of graduation."

c) "Graduates of the Class of 2007 had a 96% employment advanced degree rate within nine months of graduation."

d) "Employment within nine months of graduation of over 91% for Class of 2008."

e) "Employment within nine months of graduation of over 92% for Class of 2009."

f) "Graduates of the Class of 2010 had a 93% employment/advanced degree rate within nine months of graduation."

---

[1] Plaintiffs are John Harnish, WLS Class of 2009, Justin Schluth, WLS Class of 2010, Robert Klein, WLS Class of 2009, Gregory Emond, WLS Class of 2011, Ayla O'Brien, WLS Class of 2008, and Christina Marinakis, WLS Class of 2010. Am. Compl. ¶¶ 17-25. Plaintiffs Edward Gilson, Megan Shafranski, and Robert MacFadyen have withdrawn from the litigation. ECF Nos. 19, 50, 65.

2

NOT FOR PUBLICATION

*Id.* ¶ 35.

Plaintiffs assert that these statistics were misleading because Widener did not disclose that the employment rates included "part time legal, law-related and non-legal positions," such that "a graduate could be working in *any* capacity in *any* kind of job, no matter how unrelated to law – and would be deemed employed and working in a career 'using' the WLS law degree." *Id.* ¶¶ 36-37 (emphasis in original). Among other things, Plaintiffs also allege that "WLS did not disclose that a sizeable percentage of WLS graduates did not respond to [its graduate employment surveys], when, presumably, a high percentage of those graduates were not placed successfully." *Id.* ¶ 36. Plaintiffs indicate that "in or about early 2012," Widener "took certain remedial measures" and modified its website to provide more specific employment data. *Id.* ¶ 47. After this update, the website stated:

> Graduates of the Class of 2010 had a 93% employment / advanced degree program participation rate. This rate includes full and part time legal, law-related and non-legal positions as well as advanced degree program participation within nine months of graduation. For more information, please download a comprehensive summary of employment statistics (PDF).

*Id.*

Beyond the website and other marketing materials, Plaintiffs also claim that Widener misled them by "reporting its misleading placement rates and salary statistics to third parties such as *U.S. News* and the ABA." *Id.* ¶ 38. Plaintiffs contend that Widener's employment statistics "helped to artificially boost WLS's *U.S. News* ranking because this data constitutes 18 percent . . . of a law school's ranking." *Id.* ¶ 39. Plaintiffs explain that this false reporting was detrimental because "prospective law students rely upon" the *U.S. News* rankings to make their law school decisions. *Id.* ¶ 40.

3

NOT FOR PUBLICATION

Plaintiffs' two causes of action allege that Widener violated the New Jersey and Delaware Consumer Fraud Acts by engaging "in a pattern and practice of knowingly and intentionally making numerous false representations and omissions of material facts, with the intent to deceive and fraudulently induce reliance by Plaintiffs and the members of the Class." *Id.* ¶¶ 75, 90. Specifically, Plaintiffs claim Widener violated the New Jersey and Delaware Consumer Fraud Acts by making the following "false representations and omissions":

a) Stating false placement rates during the recruitment and retention process, including that approximately 90-95 percent of WLS graduates secured employment within nine months of graduation;

b) Manipulating post-graduate employment data, so as to give the appearance that the overwhelming majority of recent graduates secure full-time, permanent employment for which a J.D. is required or preferred;

c) Disseminating false post-graduate employment data and salary information to various third-party data clearinghouses and publications, such as the ABA and *US News*;

d) Making deceptive and misleading statements, representations and omissions concerning WLS's reputation with potential employers;

e) Making deceptive and misleading statements, representations and omissions concerning the value of a WLS degree;

f) Making deceptive and misleading statements, representations and omissions concerning the pace at which recent graduates can obtain gainful employment in their chosen field; and

g) Causing students to pay inflated tuition based on materially misleading statements, representations and omissions, including, specifically that approximately 90-95 percent of WLS graduates secure gainful employment.

*Id.* Among other things, Plaintiffs seek injunctive relief against Widener's "fraudulent and deceptive business practices" and "restitution and disgorgement . . . totaling $75 million," which they contend is "the difference between the inflated tuition paid by Class members . . . and the true value of a WLS degree." Pr. for Rel. ¶¶ 1, 3.

4

**NOT FOR PUBLICATION**

The Court denied Widener's motion to dismiss Plaintiffs' claims on March 20, 2013.

Opinion, ECF No. 33. Plaintiffs now move to certify the following class under Federal Rules of

Civil Procedure 23(a) and 23(b)(3):

> All persons who enrolled at Widener University School of Law and were charged
> full or part-time tuition within the statutory period for the six-year period prior to
> the date the Complaint in this action was filed through the date the Class is certified.

Pls.' Mem. 21, ECF No. 94-1. Widener opposes certification. Def.'s Opp., ECF No. 97.

**LEGAL STANDARD**

"The class action is an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432

(2013) (internal quotation omitted). To obtain class certification, a plaintiff "must affirmatively

demonstrate his compliance" with the four requirements of Federal Rule of Civil Procedure 23(a)

and at least one of the provisions of Rule 23(b). *Id.* Under Rule 23(a), a class may be certified only

if:

> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or
> defenses of the class, and
>
> (4) the representative parties will fairly and adequately protect the interests of the
> class.

Fed. R. Civ. P. 23(a). These "four requirements—numerosity, commonality, typicality, and

adequate representation—effectively limit the class claims to those fairly encompassed by the

named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal

quotations omitted). Rule 23(b) sets out three additional provisions, at least one of which must be

satisfied. Here Plaintiffs invoke Rule 23(b)(3), which permits class certification when a court finds

5

**NOT FOR PUBLICATION**

that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

Actual, not presumed, conformance with the Rule 23 requirements is essential. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012). To that end, when evaluating a motion for class certification, a court "is obligated to probe behind the pleadings when necessary" and "conduct a rigorous analysis of the evidence in support of certification." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163, 174 (3d Cir. 2015), *as amended* (Apr. 28, 2015). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Dukes*, 131 S. Ct. at 2551. Where a party seeks class certification under Rule 23(b)(3), the court has a "duty to take a 'close look' at whether common questions predominate over individual ones." *Comcast*, 133 S. Ct. at 1432 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)).

## DISCUSSION

Plaintiffs argue that their proposed class meets the Rule 23(a) numerosity, commonality, typicality, and adequacy requirements as well as the Rule 23(b)(3) requirements of predominance and superiority. Pls.' Mem. 3, ECF No. 94-1. Defendant Widener contests certification, arguing that the proposed class does not satisfy Rule 23(b)(3). Defs.' Opp. 2, ECF No. 97. First, Widener contends that the proposed class is not readily ascertainable. Def.'s Opp. 16-17. Second, for several reasons, Widener argues that it does not meet the Rule 23(b)(3) predominance standard. *Id.* 17-43. Finally, Widener asserts that Plaintiffs fail to address necessary choice of law questions. *Id.* 43-45. Although Widener's arguments are focused, the Court must conduct rigorous analysis as to each Rule 23 requirement.

6

**NOT FOR PUBLICATION**

### 1. The Proposed Class Is Ascertainable

Widener argues that Plaintiffs' proposed class is not ascertainable. Def.'s Mem. 16. "A plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd*, 784 F.3d at 163. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Id.* (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). The ascertainability requirement "does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members can be identified.'" *Byrd*, 784 F.3d at 163 (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.2 (3d Cir. 2013)). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593.

Widener argues that the proposed class is not ascertainable because it is "overbroad," encompassing "individuals who were never exposed to the allegedly offending marketing materials, were not harmed and who have no legally cognizable claim under the NJCFA." Def.'s Opp. 16-17. Plaintiffs respond that available records "identify all enrolled, tuition paying students for the duration of the class period," thereby "readily identify[ing] every member" of the proposed class. Pls.' Reply 5, ECF No. 99.

The "ascertainability inquiry is narrow," and it "only requires the plaintiff to show that class members can be identified." *Byrd*, 784 F.3d at 165 (quoting *Carrera*, 727 F.3d at 308 n.2)). Plaintiffs' proposed class includes "[a]ll persons who enrolled in Widener University School of Law and were charged full or part-time tuition" within a specified period. Pls.' Mem. 21. This

**NOT FOR PUBLICATION**

definition has clear objective criteria: class members must have been (1) enrolled at Widener and (2) charged tuition (3) during the set time frame. Widener's records provide a reliable and administratively feasible way to identify every class member. No mini-trials will be necessary.

Whether the proposed class includes individuals who were not exposed to Widener's alleged misrepresentations, or who were not harmed, is irrelevant for ascertainability. *See Byrd*, 784 F.3d at 167-68 (finding that district court "abused its discretion in determining that the proposed classes were not ascertainable because they were 'overly broad'"); *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 184-85 (3d Cir. 2014) ("Our cases that have addressed ascertainability have focused on whether objective records could readily identify class members."). "To the extent Defendant[] meant to challenge any potential differences between the proposed class representatives and unnamed class members, such differences should be considered within the rubric of the relevant Rule 23 requirements—such as adequacy, typicality, commonality, or predominance." *Byrd*, 784 F.3d at 169. Because each student who enrolled at Widener during the class period can be identified, the proposed class is ascertainable.

### 2. Numerosity Is Satisfied

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is "no minimum number of members needed for a suit to proceed as a class action." *Marcus*, 687 F.3d at 595. Courts must examine "the specific facts of each case," but "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Id.* (citations omitted). Because Plaintiffs' proposed class includes "thousands of former Widener students," Pls.' Mem. 23, the numerosity requirement is satisfied.

8

NOT FOR PUBLICATION

### 3. The Commonality Requirement Is Satisfied But Predominance Is Not

Rule 23(a)(2) is satisfied because common questions exist among all proposed class members, but Rule 23(b)(3) is unmet because the common questions do not predominate over questions individual to class members.

Rule 23(a)(2) requires Plaintiffs to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 131 S.Ct. at 2551 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). To make this showing, class claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "For purposes of Rule 23(a)(2), even a single common question will do." *Id.* at 2556 (quotations and alterations omitted).

In a Rule 23(b)(3) class action, which Plaintiffs seek to bring here, common questions must not only exist but also predominate over questions affecting only individual class members. Fed. R. Civ. P. 23(b)(3). This predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. "To assess predominance, a court at the certification stage must examine each element of a legal claim 'through the prism' of Rule 23(b)(3)." *Marcus*, 687 F.3d at 600 (quoting *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630 (3d Cir. 2011)). A plaintiff must "demonstrate that [each] element of [each legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2009).

9

NOT FOR PUBLICATION

### a. There Are Questions Common to the Proposed Class

Plaintiffs list a litany of questions which they claim are common to all proposed class members. These questions are whether:

> (1) Defendant inflated its graduate employment and salary statistics through improper collection processes;
>
> (2) Defendant inflated its graduate employment and salary statistics through improper aggregation methods;
>
> (3) Defendant disclosed disaggregated statistics in a way that was readily available to students;
>
> (4) a reasonable student who was exposed to Widener's misrepresentations would have believed that Widener's employment rate included temporary and non-legal jobs;
>
> (5) Widener knew that it was misleading students about its graduate employment rate and salary statistics; and
>
> (6) Widener was able to charge higher tuition based, in part, on its consistently inflated graduate employment statistics.

Pls.' Mem. 24-25. The Court need not analyze the commonality of each of these questions. The class claims proceed from a core common contention that Widener engaged in a consistent practice of disseminating misleading employment statistics to prospective and enrolled students. Pls.' Mem. 1-3. Resolving the truth or falsity of this common contention will drive resolution of this litigation as to all class members. The Rule 23(a)(2) commonality requirement is satisfied.

The Court's analysis does not end there, however, because common questions must also predominate over individual questions to warrant class certification under Rule 23(b)(3).

### b. Common Questions Do Not Predominate Over Individual Questions

Plaintiffs have not established the predominance of common questions in this case. Plaintiffs bring claims for consumer fraud under the New Jersey Consumer Fraud Act and the Delaware Consumer Fraud Act. To establish predominance, Plaintiffs must show that each element

10

**NOT FOR PUBLICATION**

of their NJCFA and DCFA claims can be proven by "evidence that is common to the class rather than individual to its members." *Hydrogen Peroxide*, 552 F.3d at 311. One element that must be established for both an NJCFA claim and a DCFA claim is loss or damages. *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 389 (2007) (To state an NJCFA claim, plaintiff must allege "(1) unlawful conduct . . . ; (2) an ascertainable loss . . . ; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss."); *Yarger v. ING Bank, FSB*, 285 F.R.D. 308, 326 (D. Del. 2012) ("To prove a claim under the DCFA, a plaintiff must show: (1) that [the defendant's] advertisements contained a false representation and/or omitted a material fact; (2) that [the defendant] intended for Plaintiffs to rely on the representation or omission; and (3) damages."). Plaintiffs have not shown that they can prove the proposed class members' damages by common evidence.

Plaintiffs' theory of damages is that Widener's alleged misrepresentations inflated its tuition prices above what they should have been, and all Widener students suffered damages when they paid the extra, "inflated" tuition amount. Pls.' Mem. 17-18. Plaintiffs intend to prove damages on a classwide basis by using an expert statistical analysis to quantify the alleged tuition inflation. *Id.* at 18. They advance a regression analysis which, according to their expert, uses "data from 64 private law schools from the bottom two ranked tiers listed by *U.S. News & World Report*" to measure "the impact of employment rate on Widener's tuition prices while controlling for other factors." *Id.* From this analysis, Plaintiffs' expert concludes that "[t]o the extent that law school job placement statistics are overstated or inflated in publicly distributed information including advertisements and/or websites . . . they will be reflected in higher law school tuition costs for JD programs relative to tuition costs that reflect accurate job placement statistics." *Id.* at 19. In sum, Plaintiffs intend their expert's analysis to prove that all class members paid a certain extra amount

11

**NOT FOR PUBLICATION**

of tuition due to Widener's alleged misrepresentations about its graduates' employment success. This theory of common damages is unacceptable for two reasons.

First, Plaintiffs' theory that all Widener students sustained corresponding damages ignores the reality that many students obtained the full-time legal jobs they sought when enrolling at Widener and paying its tuition. The Court recognizes that Plaintiffs and other proposed class members may have experienced ascertainable losses as a result of Widener's alleged misrepresentations that they were highly likely to get full-time legal jobs. But other Widener students, whom Plaintiffs seek to include in the class, actually got the advertised jobs. Am. Compl. ¶ 47 (stating that 56% of 2010 graduates who responded to Widener's employment survey "were employed in full-time legal work"). The loss, if any, which those students may have experienced as a result of Widener's alleged misrepresentations is different from the loss incurred by students who did not obtain full-time legal employment. As such, individual questions predominate over common questions regarding the loss each proposed class member sustained.

Second, Plaintiffs' method of proving classwide damages relies on a "fraud on the market" theory which New Jersey courts have rejected outside the federal securities fraud context. In *International Union*, the New Jersey Supreme Court considered an argument nearly identical to Plaintiffs' argument here: that "defendant's marketing scheme created an effect on the price of Vioxx [a pharmaceutical] such that the ascertainable loss element of [the NJ]CFA may be proven, on a class-wide basis, by reliance on expert analysis alone." *Int'l Union*, 192 N.J. at 391. The Court rejected the plaintiff's attempt to prove common damages through expert price inflation analysis, finding that "rely[ing] on a single expert to establish a price effect in place of a demonstration of an ascertainable loss . . . would indeed be the equivalent of fraud on the market, a theory we have not extended to [NJ]CFA claims." *Id.* at 392.

12

-Ja60-

NOT FOR PUBLICATION

Plaintiffs argue that their expert's analysis is acceptable because it "does not presuppose price inflation," but rather employs a regression analysis to identify "a significant, positive price relationship" between advertised employment rates and law school tuition levels. Pls.' Reply 13-14. Although multiple regression analysis is a viable method of economic analysis,[2] Plaintiffs' theory of damages still relies on a market dynamic that they have not proved to exist. Whereas securities markets are theorized to reflect material public information in security prices, Plaintiffs offer no evidence that a similar market dynamic adjusts law school tuition levels to reflect public disclosures about the schools' employment rates. *See In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, Civ. No. 06- 5774, 2009 WL 2043604, at *21 (D.N.J. July 10, 2009) ("Whereas the price of securities are set by the price at which buyers are willing to buy the securities and sellers are willing to sell, here, . . . Plaintiffs' theory of injury relies upon the faulty assumption that the prices of [pharmaceuticals] fluctuate in a similar manner"); *see also Kaufman v. i-Stat Corp.*, 165 N.J. 94, 113-18 (2000) (discussing the Efficient Capital Markets Hypothesis and declining to extend fraud on the market theory to New Jersey common law fraud actions).

As a means of identifying common damages, Plaintiffs' regression analysis depends on the assumption that law school tuition prices accurately reflect the schools' advertised employment rates. Pls.' Mem. 19. That is, the regression analysis purports to calculate ascertainable loss by identifying the difference between what Widener's tuition was with the alleged misrepresentations and what it would have been without them. The problem with this analysis is that Widener sets its tuition prices, not active traders in a market for seats in its classes. The regression analysis may

---

[2] Plaintiffs advance this Court's opinion in *In re Bulk (Extruded) Graphite Products Antitrust Litig.*, Civ. No. 02-6030 (WHW), 2006 WL 891362 (D.N.J. Apr. 4, 2006), in support of their attempt to prove common damages by regression analysis. This case does not aid Plaintiffs. It deals with measuring damages from an antitrust conspiracy and offers no support for applying a "fraud on the market" theory in a consumer fraud action alleging that misrepresentations caused price inflation.

13

**NOT FOR PUBLICATION**

show that without the alleged misrepresentations, according to prevailing law school tuition levels, Widener *should* have had lower tuition prices, but it does not show that it *would* have had lower tuition prices. Plaintiffs' regression analysis is insufficient to prove that the proposed class members sustained common damages from Widener's alleged misrepresentations.[3]

Because Plaintiffs have not shown that the damages elements of their NJCFA and DCFA claims can be established by common proof, Plaintiffs' proposed class cannot be certified under Rule 23(b)(3).

### 4. Typicality Is Not Satisfied

Plaintiffs have also failed to demonstrate that the named plaintiffs' claims are "typical of the claims . . . of the proposed class." Fed. R. Civ. P. 23(a)(3). "Typicality ensures the interests of the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.'" *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182-83 (3d Cir. 2001), *as amended* (Oct. 16, 2001). "[T]he proper consideration in assessing typicality [] include[s] three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009). "[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives

---

[3] The Court acknowledges Plaintiffs' contention that "Widener has not produced any information about tuition prices, how it sets those prices, or any Widener price analyses." Pls.' Reply 17. Such information is relevant to class discovery and should be produced, if available, to aid Plaintiffs in assessing whether putative class members' damages can be proved by common evidence.

14

**NOT FOR PUBLICATION**

rise to the claims of the class members, and if it is based on the same legal theory." *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006) (internal quotations omitted).

It is not clear that all members of the proposed class were exposed to the false representations or omissions Plaintiffs allege. Plaintiffs' core allegation is that Widener disseminated misleading employment statistics "between 2005 and 2011." Am. Compl. ¶ 5. The proposed class definition, however, includes Widener students who enrolled "through the date that this Class is certified," Pls.' Mem. 21, thereby including students who enrolled in 2012, 2013, and 2014. The amended complaint itself indicates that Widener changed its reporting of employment statistics "in or about early 2012" and published a "comprehensive summary" of employment data on its website. Am. Compl. ¶ 47. Because the factual circumstances underlying claims of students who enrolled at Widener after 2011 are markedly different from Plaintiffs' claims, Plaintiffs' claims are not typical of the class claims as a whole.

It is also possible that putative class members have interests which do not align with Plaintiffs' interests. Widener alumni who are pursuing legal careers in which their professional status is, to some degree, linked to the reputation of their law school may not want Widener to be held liable for violating consumer fraud laws. In other cases where a defendant's liability would benefit some class members but hurt the interests of others, courts have found class certification inappropriate. *See, e.g.*, *Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988); *Phillips v. Klassen*, 502 F.2d 362, 366-67 (D.C. Cir. 1974).

15

**NOT FOR PUBLICATION**

## CONCLUSION

The Court need not address the other Rule 23 factors requisite to class certification.

Plaintiffs' motion is denied. An appropriate order follows.


Date: July 1, 2015

/s/ **William H. Walls**
United States Senior District Judge


16

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN HARNISH, et al., on behalf of themselves and all others similarly situated, <br><br>                            Plaintiffs, <br> v. <br><br> WIDENER UNIVERSITY SCHOOL OF LAW, and DOES 1-20, <br><br>                           Defendants. | **ORDER** <br><br> Civ. No. 12-00608 (WHW) (CLW) |

**Walls, Senior District Judge**

It is on this 1st day of July, 2015:

ORDERED that Plaintiffs' motion for class certification is denied.

                        **/s/ William H. Walls**
                        United States Senior District Judge

# EXHIBIT B

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN HARNISH, et al., on behalf of themselves and all others similarly situated, <br><br>       Plaintiffs, <br><br>   v. <br><br> WIDENER UNIVERSITY SCHOOL OF LAW, and DOES 1-20, <br><br>       Defendants. | **OPINION** <br><br> Civ. No. 12-00608 (WHW) (CLW) |

**Walls, Senior District Judge**

Plaintiffs move for reconsideration of this Court's order of July 1, 2015, ECF No. 101, denying class certification in this consumer fraud action against Defendant Widener University School of Law ("Widener"). Without oral argument under Federal Rule of Civil Procedure 78(b), Plaintiffs' motion is denied.

### LEGAL STANDARD

Local Civil Rule 7.1(i) allows a party to move for reconsideration within 14 days after the entry of an order, and directs the moving party to submit "[a] brief setting forth concisely the matter or controlling decisions which the party believes the Judge . . . has overlooked." L. Civ. R. 7.1(i). The Third Circuit has held that the "purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).

Reconsideration motions may not be used to relitigate old matters, nor to raise arguments or present evidence that could have been raised before the entry of judgment. *See* Charles A.

**NOT FOR PUBLICATION**

Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2810.1. Such motions will

only be granted where (1) an intervening change in the law has occurred, (2) new evidence not

previously available has emerged, or (3) the need to correct a clear error of law or prevent a

manifest injustice arises. *North River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir.

1995).

**DISCUSSION**

In its opinion denying class certification, this Court did not overlook any settled law. Nor

did the Court overlook its earlier opinions, as Plaintiffs claim. Pls.' Mem. 5-8, ECF No. 104-1.

The Court has consistently recognized Plaintiffs' theory that they paid an "inflated" tuition due to

Widener's misrepresentations about its employment rates. *See* Op. on Mot. Dismiss 18, ECF No.

33; Op. on Mot. Recons. 7, ECF No. 43; Op. on Mot. Certif. 11-12, ECF No. 101. On Plaintiffs'

motion for class certification, the Court was required to decide whether Plaintiffs' proposed class

satisfied Federal Rule of Civil Procedure 23, and concluded that it did not. The Court's opinion

did not disregard Plaintiffs' theory that all proposed class members paid a falsely inflated tuition

price. Rather, the Court concluded that individual questions predominate over common questions

regarding the loss that each proposed class member sustained by paying Widener's allegedly

inflated tuition. Op. on Mot. Certif. at 12. Even if all proposed class members paid "inflated"

tuition—by paying a premium for overstated job placement rates—the fact remains that some

proposed class members got what they paid for. *Id.* They obtained the full-time legal jobs for which

they paid tuition, whether it was inflated or not. Their loss, if any, was different from that of

students who paid the allegedly inflated tuition and did not obtain full-time legal employment.

Individual questions predominate as to class members' ascertainable losses, and Rule 23(b)(3) is

unmet.

2

**NOT FOR PUBLICATION**

Plaintiffs' other arguments for reconsideration are also meritless. Plaintiffs' proposed method of proving all class members' ascertainable losses by common expert analysis has been rejected by the New Jersey Supreme Court. *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 391-93 (2007). And this Court did not overlook the alleged facts regarding Widener's post-2011 data collection practices or misrepresentations. There has been no intervening change in the law, and no new evidence not previously available has emerged. Plaintiffs did not present anything in the motion for reconsideration that they did not present before—nothing is being said now that was not said then. As a result, this motion for reconsideration is denied. *See North River Ins. Co.*, 52 F.3d at 1218; *Max's Seafood Cafe*, 176 F.3d at 677; *Buffa v. N.J. State Dep't of Judiciary*, 56 Fed. App'x 571, 575 (3d Cir. 2003); *Gutierrez v. Ashcroft*, 289 F. Supp. 2d 555, 561 (D.N.J. 2003).

**CONCLUSION**

Plaintiffs' motion for reconsideration is denied. An appropriate order follows.

Date: August //, 2015

Hon. William H. Walls
United States Senior District Judge

3

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

JOHN HARNISH, et al., on behalf of themselves and
all others similarly situated,

                 Plaintiffs,

     v.

WIDENER UNIVERSITY SCHOOL OF LAW, and
DOES 1-20,

                 Defendants.

**ORDER**

Civ. No. 12-00608 (WHW) (CLW)

**Walls, Senior District Judge**

It is on this ⁄th day of August, 2015:

ORDERED that Plaintiffs' motion for reconsideration is denied.

                        Hon. William H. Walls
                United States Senior District Judge

## CERTIFICATE OF SERVICE

I, David S. Stone, hereby certify that on August 19, 2015, I caused a true and correct copy of the foregoing to be served by electronic mail and overnight delivery upon the following counsel:

Dennis J. Drasco
Arthur M. Owens
Lum, Drasco & Positan, LLC
103 Eisenhower Parkway
Roseland, NJ 07068-1049
ddrasco@lumlaw.com
aowens@lumlaw.com

Thomas F. Quinn
Suna Lee
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
200 Campus Drive
Florham Park, NJ 07932
thomas.quinn@wilsonelser.com
suna.lee@wilsonelser.com

Dated: August 19, 2015

David S. Stone

15-8086 Case Caption                        1                    August 21, 2015 9:29 AM

JOHN HARNISH; JUSTIN SCHLUTH; ROBERT KLEIN;
GREGORY EMOND; AYLA O'BRIEN KRAVITZ; CHRISTINA MARINAK,

                              Petitioners

v.

WIDENER UNIVERSITY SCHOOL OF LAW

OFFICE OF THE CLERK

**MARCIA M. WALDRON**

**CLERK**

UNITED STATES COURT OF APPEALS



21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE
215-597-2995



August 21, 2015

Dennis J. Drasco, Esq.
Arthur M. Owens, Esq.
Lum, Drasco & Positan
103 Eisenhower Parkway
Roseland, NJ 07068

David B. Harrison, Esq.
David S. Stone, Esq.
Stone & Magnanini
100 Connell Drive
Suite 2200
Berkeley Heights, NJ

Suna Lee, Esq.
Thomas F. Quinn, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker
150 East 42nd Street
New York, NY 10017

Danielle F. Moriber, Esq.
Carolyn B. Rendell, Esq.
Stone & Magnanini
100 Connell Drive
Suite 2200
Berkeley Heights, NJ

RE: John Harnish, et al v. Widener University School of L
Case Number: 15-8086
District Case Number: 2-12-cv-00608

**Effective December 15, 2008, the Court implemented the Electronic Case Files
System. Accordingly, attorneys are required to file all documents electronically.
<u>See</u> 3d Cir. L.A.R. 113 (2008) and the Court's CM/ECF website at
www.ca3.uscourts.gov/ecfwebsite.**

51 of 52

To All Parties:

The Clerk has received a petition for leave to appeal filed by **Robert Klein, John Harnish, Gregory Emond, Christina Marinak, Ayla O'Brien Kravitz, Justin Schluth**, docketed at **No. 15-8086**. All inquiries should be directed to your Case Manager in writing or by calling the Clerk's Office at 215-597-2995. This Court's rules, forms, and case information are available on our website at http://www.ca3.uscourts.gov.

**Counsel for Petitioner**
As counsel for Petitioner(s), you must file:
1. Application for Admission (if applicable);
2. Appearance Form; and,
3. Disclosure Statement (except governmental entities).
These forms must be filed within **fourteen (14) days of the date of this letter**.

Should the Court grant the petition for leave to appeal, additional forms and the appellate portion of the filing and docketing fee will be required.

Any response in opposition must be filed **within ten (10) days** of the date of this letter. **All responses must be accompanied by an Appearance Form and Disclosure Statement.** The petition and any response(s) will be forwarded to the Court for disposition. The parties will be advised when an order is entered by the Court.

Parties who do not intend to participate in the petition must notify the Court in writing.

Very truly yours,

*Marcia M. Waldron*

Marcia M. Waldron,
Clerk

By: Timothy/tmm
Case Manager
267-299-4953